IN THE
# United States Court of Appeals for the Eighth Circuit

---

IOWA MIGRANT MOVEMENT FOR JUSTICE, *ET AL.*,
*Plaintiffs-Appellees*,

v.

BRENNA BIRD, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF IOWA,
*Defendant-Appellant*,

KIMBERLY GRAHAM AND ZACH HERRMANN,
*Defendants*.

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

THE STATE OF IOWA, *ET AL.*,
*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Southern District of Iowa
Case Nos. 4:24-cv-00161-SHL, 4:24-cv-00162-SHL
(The Honorable Stephen H. Locher)

---

## DEFENDANTS-APPELLANTS' ADDENDUM

---

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*

PATRICK C. VALENCIA
*Deputy Solicitor General*

July 24, 2024

BREANNE STOLTZE
*Assistant Solicitor General*
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-8770
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

Order Granting Motion for Preliminary Injunction, *Iowa Migrant Movement for Justice v. Bird*, No. 24-cv-161 (S.D. Iowa June 17, 2024) (R. Doc. 51) ..................................................................01

Order Granting Motion for Preliminary Injunction, *United States v. Iowa*, No. 24-cv-162 (S.D. Iowa June 17, 2024) (R. Doc. 29)......26

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>STATE OF IOWA; KIMBERLY REYNOLDS, in her official capacity as Governor of the State of Iowa; BRENNA BIRD, in her official capacity as Attorney General of the State of Iowa; IOWA DEPARTMENT OF PUBLIC SAFETY; and STEPHAN K. BAYENS, in his official capacity as Commissioner of Iowa Department of Public Safety,<br><br>Defendants. | Case No. 4:24-cv-00162-SHL-SBJ<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA MIGRANT MOVEMENT FOR JUSTICE; JANE DOE; and ELIZABETH ROE,<br><br>Plaintiffs,<br><br>vs.<br><br>BRENNA BIRD, in her official capacity as Attorney General of the State of Iowa; KIMBERLY GRAHAM, in her official capacity as Polk County Attorney; and ZACH HERRMANN, in his official capacity as Clayton County Attorney,<br><br>Defendants. | Case No. 4:24-cv-00161-SHL-SBJ<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |

1

**Add. 1**

## I.    INTRODUCTION.

Dissatisfied with how the United States Government is handling immigration, the Iowa Legislature decided to take matters into its own hands by enacting new legislation (known as Senate File 2340) that, among other things: (i) imposes criminal penalties under state law for certain immigration-related offenses; and (ii) requires state court judges to order noncitizens to return to the foreign countries from which they came. As a matter of politics, the new legislation might be defensible. As a matter of constitutional law, it is not. Under binding Supreme Court precedent, Senate File 2340 is preempted in its entirety by federal law and thus is invalid under the Supremacy Clause. The Court therefore GRANTS the motions for preliminary injunction filed by Plaintiffs in these related cases and ENJOINS the enforcement of Senate File 2340 pending further proceedings.

## II.    BACKGROUND.

### A.  Senate File 2340.

On April 10, 2024, Iowa Governor Kim Reynolds signed into law Senate File 2340, which adds Chapter 718C to the Iowa Code. The law goes into effect on July 1, 2024, and creates two new criminal offenses under Iowa law. The first, codified at Iowa Code § 718C.2(1), states:

> 1. A person who is an alien commits an offense if the person enters, attempts to enter, or is at any time found in this state under any of the following circumstances:
>
>     a. The person has been denied admission to or has been excluded, deported, or removed from the United States.
>     b. The person has departed from the United States while an order of exclusion, deportation, or removal is outstanding.

Iowa Code § 718C.1(1) defines "alien" to "mean[] the same as defined in 8 U.S.C. § 1101, as of January 1, 2023." As of January 1, 2023, "alien" was defined as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).[1] A violation of § 718C.2(1) is generally an aggravated misdemeanor, although it can be a class "C" or "D" felony if the person has qualifying prior convictions or satisfies other conditions. *See id.* § 718C.2(2).

The second new criminal offense is codified at § 718C.5(1), which states:

> 1. A person who is an alien commits an offense if all of the following are true:

---

[1] The definition of "alien" remains the same today.

2

**Add. 2**

> a. The person has been charged with or convicted of an offense under this chapter.
> b. A judge has issued an order under this chapter for the person to return to the foreign nation from which the person entered or attempted to enter.
> c. The person failed to comply with the order.

A violation of § 718C.5(1) is a class "C" felony. *Id.* § 718C.5(2).

Following a person's initial appearance on the charge of violating §§ 718C.2(1) or 718C.5(1), a state court judge is permitted to issue a written order "discharg[ing] the person and requir[ing] the person to return to the foreign nation from which the person entered or attempted to enter…." *Id.* § 718C.4(3). Such an order is permitted only with the person's consent, and only if the person has not been previously convicted of an offense under Chapter 718C. *Id.* If a person charged with an offense under Chapter 718C does *not* consent to an order requiring them to return to the foreign nation, the State may continue with the prosecution under §§ 718C.2(1) or 718C.5(1). *Id.* Section 718C.6 states: "A court may not abate the prosecution of an offense under this chapter on the basis that a federal determination regarding the immigration status of the person is pending or will be initiated."

"Upon a person's conviction of an offense under [Chapter 718C], the judge shall enter in the judgment in the case an order requiring the person to return to the foreign nation from which the person entered or attempted to enter. An order issued under this subsection takes effect on completion of the term of confinement or imprisonment imposed by the judgment." *Id.* § 718C.4(4). Such an order must identify the "manner of transportation of the person to a port of entry" and the "law enforcement officer or state agency responsible for monitoring compliance with the order." *Id.* § 718C.4(5). Iowa Code § 718C.1(2) defines "port of entry" to "mean[] a port of entry in the United States as designated by 19 C.F.R. pt. 101." According to the Code of Federal Regulations, there are two ports of entry in Iowa: the Des Moines International Airport and Quad Cities International Airport. *See* 19 C.F.R. § 101.3.[2]

   B. *The Iowa Migrant Movement for Justice Plaintiffs.*

Plaintiff Iowa Migrant Movement for Justice ("Iowa MMJ") is a statewide membership-based legal service and advocacy organization headquartered in Des Moines, Iowa. (Iowa MMJ

---

[2] The Quad Cities International Airport is actually in Moline, Illinois, and thus it appears that the Code of Federal Regulations is inaccurate. This is not material to the outcome here.

Docket[3] ECF 9-5, ¶ 3.) Its legal staff provides immigration representation and consultations to noncitizens, advising over 2,400 clients in 2023. (Id., ¶¶ 6, 9.) Iowa MMJ's advocates seek to improve immigrants' lives in four ways, through issue campaigns, narrative change, coalition building, and civic engagement. (Id., ¶¶ 10–15.) Erica Johnson, Iowa MMJ's founding executive director, asserts that Senate File 2340 will frustrate Iowa MMJ's ability to keep providing services. (Id., ¶¶ 2, 25, 36.) She explains that Senate File 2340 will require Iowa MMJ to expand their intake process to analyze potential state criminal prosecution for immigration offenses, which will divert legal staff's attention away from other priorities and toward things like helping clients fill out Freedom of Information Act requests to compile a full immigration profile, which wasn't previously required. (Id., ¶¶ 27, 29.) As a result, Iowa MMJ won't be able to serve as many clients and its grant funding, which requires Iowa MMJ to meet specific deliverables, may be jeopardized. (Id., ¶ 25.) Iowa MMJ's legal staff also will need to analyze Senate File 2340's effect on past clients and defend clients against prosecution in state court, which, again, will pull resources away from current projects. (Id., ¶¶ 30–31.) Iowa MMJ's new focus on these areas will impede its ability to represent lawful permanent residents in their naturalization applications, help those with DACA renew their status, and represent Afghan evacuees, all of which are currently among Iowa MMJ's "core" services. (Id., ¶¶ 25, 35.)

According to Johnson, Iowa MMJ's advocacy work has already changed to accommodate Senate File 2340. (Id., ¶ 36.) Before the bill passed, staff devoted significant resources to opposing it. (Id., ¶ 37.) After it was enacted, staff started educating the community about its consequences. (Id., ¶ 38.) When staff are fielding calls from members about the bill and preparing fact sheets and arranging speakers to discuss Senate File 2340, they can't engage in grassroots efforts or traditional outreach activities, both of which are "core" advocacy functions. (Id., ¶¶ 39–41.) Johnson expects Senate File 2340 to continue to frustrate Iowa MMJ's advocacy goals even after the public is educated; for example, the law will break down community bonds and damage other relationships Iowa MMJ has worked for years to cultivate. (Id., ¶ 43.)

Plaintiffs Jane Doe and Elizabeth Roe are members of Iowa MMJ. (Id., ¶¶ 23–24.) Doe is a lawful permanent resident of the United States and citizen of Mexico. (Iowa MMJ Docket ECF 9-3, ¶ 2.) She is a 68-year-old widow with five children and seventeen grandchildren. (Id.) She has never been convicted of a crime. (Id., ¶ 3.) In 2000, Doe and her children came to the United States

---

[3] All references to the "Iowa MMJ Docket" are to the electronic case filings in Case No. 4:24-cv-00161.

to reunite with her husband, who was a United States citizen. (Id., ¶¶ 5, 9.) In 2005, she returned to Mexico after her mother passed away. (Id., ¶ 10.) When Doe tried to reenter the United States a few months later, she was stopped by immigration officials, detained for about half a day, and sent back to Mexico. (Id.) She was issued a removal order. (Id.)

Because Doe's husband had U.S. citizenship, he was able to file a petition for her to return to the United States. (Id., ¶ 12.) However, he died before it was approved. (Id.) After his death, the petition was converted to a widow petition and eventually approved, with her prior removal order being waived. (Id., ¶¶ 13–15.) As a result of the approval, Doe obtained a green card and became a lawful permanent resident. (Id., ¶¶ 14–15.) She settled in Garnavillo, Iowa, because two of her daughters live in Iowa for work. (Id., ¶ 16.) She is using the pseudonym "Jane Doe" because she is scared of being prosecuted under the law and removed to Mexico. (Id., ¶ 17.) She also wants to avoid the stress and anxiety of having her name made public. (Id., ¶ 20.)

Roe is a lawful permanent resident of the United States and citizen of Columbia. (Iowa MMJ Docket ECF 9-4, ¶ 2.) She is forty years old and married to a United States citizen. (Id.) She has never been convicted of a crime. (Id., ¶ 3.) She came to the United States for the first time in September 2016 to reunite with her brothers, both of whom are United States citizens. (Id., ¶ 6.) Immigration officials detained her at the border for twenty-four hours and gave her an expedited removal order. (Id., ¶ 7.) However, they released her from custody and allowed her to go to Iowa, subject to the requirement that she report to the immigration office every month. (Id.) In February 2017, Roe was deported for missing a reporting date. (Id., ¶¶ 8–9.) She married her husband in Columbia in April 2018, and he applied for her to obtain a green card and return to the United States to live with him. (Id., ¶ 10.) Her prior removal order was waived as part of the green card application process, and the application was eventually approved. (Id., ¶¶ 11, 13.) She returned to the United States as a lawful permanent resident in May 2023. (Id., ¶ 13.) She now lives in Des Moines, Iowa. (Id., ¶ 4.) She is using the pseudonym "Elizabeth Roe" because she is afraid of the consequences of her true name becoming public. (Id., ¶ 16.)

### C. *Potential Impacts of Senate File 2340 on Federal Immigration Laws and International Relations.*

The United States submitted three Declarations regarding the impact of Senate File 2340. The first is from Eric Jacobstein, who is employed by the United States Department of State as

Add. 5

Deputy Assistant Secretary in the Bureau of Western Hemisphere Affairs. (United States Docket[4] ECF 7-2, ¶ 1.) According to Jacobstein, Senate File 2340 threatens to harm United States foreign relations in four ways: (1) it antagonizes foreign governments; (2) it threatens to undermine the federal government's comprehensive policy framework for addressing regional irregular migration; (3) it is inconsistent with the United States' treaty obligations; and (4) it risks reciprocal and retaliatory treatment of United States citizens abroad. (Id., ¶ 8.)

As it relates to animosity with foreign governments, Jacobstein says the Mexican government has already expressed concerns about SF 2340 in public statements and during meetings with State Department and White House officials. (Id., ¶ 11.) The Mexican government expressed similar concerns with a recent bill enacted in Texas, known as "S.B. 4," which has considerable overlap with Senate File 2340. (Id., ¶ 12.) Like S.B. 4, Jacobstein says one of the challenges with Senate File 2340 is that it permits Iowa state judges to order removal of a person to the country from which the person entered, without knowing whether the person is a citizen of that country or if that country will accept them. (Id., ¶ 13.) This will "frustrate the United States' relations with other countries regarding noncitizen removals and likely other important bilateral issues." (Id.) According to Jacobstein, Senate File 2340 also affects the efficacy of federal actions to secure the border and stem irregular migration. (Id., ¶ 15.) He says that "[d]iplomatic discussions concerning migration are delicate and cannot be successful if the government does not speak with one voice." (Id., ¶ 16.)

As it relates to comprehensive foreign policy strategy, Jacobstein says the United States "must establish long-term strategic partnerships with the governments in the [North and Central American] region to catalyze structural change to root out corruption and impunity, improve security and the rule of law, and increase economic opportunity." (Id., ¶ 18.) The United States has used an executive order, Executive Order 14010, to "outline[] a comprehensive foreign-policy framework to collaboratively manage migration." (Id., ¶ 19.) This has resulted in cooperative strategies with foreign governments like Mexico. (Id., ¶¶ 19–21.) These strategies are designed, among other things, to strengthen asylum systems and regularization programs in countries other than the United States. (Id., ¶ 22.) Jacobstein says Senate File 2340 undermines these efforts because it is inconsistent with the United States' treaty obligations and therefore damages the country's credibility. (Id., ¶¶ 23–24.)

---

[4] All references to "United States Docket" are to the electronic case filing system in Case No. 4:24-cv-00162.

Speaking of treaty obligations, Jacobstein says Senate File 2340 is inconsistent with the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (the "Convention Against Torture"), which prohibits the return of noncitizens to countries where they face torture. (Id., ¶ 25.) Similarly, under the 1967 United Nations Protocol Relating to the Status of Refugees (the "Refugee Protocol"), noncitizens may be entitled to withholding of removal if they will face persecution in the country to which they would be returned on the basis of race, religion, nationality, membership in a particular social group, or political opinion. (Id.) Jacobstein points out that Senate File 2340 contains no exception for an individual who fears persecution or torture and therefore could result in "refoulement," which occurs when a noncitizen is constructively or actually forced to return to a place where the noncitizen will face persecution or torture. (Id., ¶¶ 26–27.) Not only would this potentially violate the United States' treaty obligations, it also would compromise the United States' credibility in negotiations with foreign governments on the same and similar issues. (Id., ¶¶ 28–29.)

Finally, Jacobstein says Senate File 2340 will create a risk of reciprocal and retaliatory treatment of United States citizens at home and abroad. (Id., ¶ 30.) For example, he points out that Russia passed a law in 2012 banning the adoption of Russian children by United States citizens in retaliation for the United States passing a law designed to punish Russian officials for the death of a Russian prisoner. (Id.) Jacobstein reiterates that "it is critically important that national immigration policy be governed by a uniform legal regime, and that decisions regarding the development and enforcement of immigration policy be made by the federal government, so that the United States can speak to the world with one voice." (Id., ¶ 32.)

The United States' second Declaration is from Ted Kim, the Associate Director of the Refugee, Asylum and International Operations ("RAIO") Directorate within the U.S. Citizenship and Immigration Services ("USCIS"), U.S. Department of Homeland Security ("DHS"). (United States Docket ECF 7-3, ¶ 1.) Kim's Declaration focuses on the asylum application process in the United States, which is a detailed and comprehensive process designed to ensure that noncitizens are not returned to countries where they may be tortured or persecuted. (Id., ¶¶ 4–8.) Federal asylum laws and regulations are designed, among other things, to satisfy the United States' obligations under the nonrefoulement provisions of the Convention Against Torture and Refugee Protocol. (Id., ¶¶ 4–5.) Asylum applications can be filed proactively by noncitizens to USCIS or defensively in removal proceedings before the Department of Justice's Executive Office for

Immigration Review ("EOIR"). (Id., ¶ 6.) Either way, specially trained federal officials and judges evaluate whether the noncitizen has a credible fear of persecution or torture. (Id., ¶¶ 14–15.) According to Kim, Senate File 2340 "does not appear to have any of the safeguards in place for asylum applicants, or for noncitizens seeking withholding of removal or protection under the Convention Against Torture that are available under U.S. law." (Id., ¶ 16.) Accordingly, in his view, Senate File 2340 will impact potential and actual asylum applicants, as well as noncitizens applying for statutory withholding from removal and protection under the Convention Against Torture. (Id., ¶ 17.) "Furthermore, noncitizens detained under SF 2340, or removed from the United States, would be unable to participate fully in federal immigration proceedings," thus potentially impacting the outcome of those proceedings. (Id., ¶ 18.)

The United States' third and final Declaration is from Russell Hott, the Deputy Executive Associate Director of DHS, United States Immigration and Customs Enforcement ("ICE"), and Enforcement and Removal Operations ("ERO"). (United States Docket ECF 7-4, ¶ 1.) ICE is responsible for enforcing more than 400 federal statutes, and its mission includes removing noncitizens who lack lawful immigration status or are otherwise removable under federal law. (Id., ¶ 6.) For non-detained individuals alone, ICE manages a docket of more than 7.2 million cases. (Id., ¶ 7.) There are over 6,000 immigration officers employed by ERO, plus another 6,100 Special Agents employed by ICE's law enforcement component, Homeland Security Investigations. (Id., ¶ 8.) Effective November 29, 2021, the Secretary of Homeland Security issued Department-wide guidance prioritizing DHS's limited law enforcement resources on the apprehension and removal of noncitizens who threaten national security, public safety, and border security. (Id., ¶¶ 9–10.) Hott's Declaration summarizes the removal process under the Immigration and Nationality Act, which involve due process protections, multiple avenues for relief, and several layers of review by immigration judges and Article III judges. (Id., ¶¶ 11–17.) Hott says that Senate File 2340 "does not appear to ensure comparable procedures," but rather requires state court judges to proceed with prosecutions under Iowa Code Chapter 718C even if federal proceedings are pending or may be initiated. (Id., ¶ 18.)

According to Hott, as of April 14, 2024, ICE has almost 5,000 cases involving a final order of removal for a person with a last claimed address in Iowa. (Id., ¶ 19.) In addition, ERO has more than 23,000 cases involving non-detained noncitizens who provided a last claimed address in Iowa. (Id.) If Iowa imposes criminal penalties for unlawful reentry by noncitizens, it might lead those

citizens to depart Iowa for other states, thus straining ICE's resources to try to find them. (Id., ¶ 20.) Moreover, Hott says Iowa has not identified a mechanism for effectuating and verifying the return of noncitizens to the country from which they entered, thus creating the risk of potential confusion and strained relationships. (Id., ¶ 21.) The immigration laws passed by Iowa and other states, if allowed to go into effect, will create "a piecemeal system of immigration" and force the federal government to "navigate an impossible patchwork of regulations affecting the enforcement of federal law." (Id., ¶ 22.)

     *D. Procedural Posture.*

On May 9, 2024, the Iowa MMJ Plaintiffs filed their Complaint for Declaratory and Injunctive Relief against Iowa Attorney General Brenna Bird, Polk County Attorney Kimberly Graham, and Clayton County Attorney Zach Herrmann. (Iowa MMJ Docket ECF 1.) Later the same day, the United States filed its Complaint against the State of Iowa, Iowa Governor Kim Reynolds, Iowa Attorney General Bird, the Iowa Department of Public Safety, and Iowa Department of Public Safety Commissioner Stephan Bayens. (United States Docket ECF 1.) Both the Iowa MMJ Plaintiffs and United States seek a declaratory judgment and preliminary and permanent injunctive relief enjoining the enforcement of Senate File 2340. On May 10, 2024, the Iowa MMJ Plaintiffs formally moved for a preliminary injunction, supported by declarations. (Iowa MMJ Docket ECF 9.) The United States followed suit three days later, also supported by declarations. (United States Docket ECF 7.) In the Iowa MMJ Case, Defendants Graham and Herrmann have agreed to comply with any injunction the Court might enter but otherwise have agreed with the Iowa MMJ Plaintiffs to a stay. (Iowa MMJ Docket ECF 26, ECF 33.) All other Defendants resist the motions for preliminary injunction. (Iowa MMJ Docket ECF 36; United States Docket ECF 19.) These Defendants did not submit declarations or present other factual evidence; rather, they resist the motions for preliminary injunction entirely on legal grounds. (For simplicity, this Order will use the term "Defendants" or the "State" to refer to all Defendants other than Graham and Herrmann.)

The Court has not formally consolidated the two cases. In the interest of efficiency, however, the Court did hold a single hearing on the two motions for preliminary injunction. The Court is likewise issuing this single ruling to address both motions, although the unique features of each case will be discussed where relevant below.

## III.   PRELIMINARY INJUNCTION STANDARD.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Tumey v. Mycroft AI, Inc*., 27 F.4th 657, 664 (8th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008)). "[T]he burden of establishing the propriety of an injunction is on the movant." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021). The Court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (alteration in original) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc*., 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). "While no single factor is determinative, the probability of success factor is the most significant." *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (cleaned up). For actions that seek to enjoin the enforcement of a duly enacted state statute, the moving parties must show that they are likely to prevail on their claims. *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1000 (8th Cir. 2019). This is a higher standard than applies in other preliminary injunction cases. *See id*. "We apply a heightened standard in such instances because the duly enacted state statute constitutes government action based on presumptively reasoned democratic processes, and such action is entitled to a higher degree of deference and should not be enjoined lightly." *Id*. (internal punctuation and citation omitted).

With respect to the remaining three factors, a plaintiff "is not required to prove with certainty the threat of irreparable harm, but it must prove that 'irreparable injury is likely in the absence of an injunction.'" *Sleep No. Corp.*, 33 F.4th at 1018 (quoting *Winter*, 555 U.S. at 22). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "In balancing the equities, [the Court] weigh[s] 'the threat of irreparable harm' shown by the movant against 'the injury that granting the injunction will inflict on other parties litigant.'" *MPAY Inc. v. Erie Custom Comput. Applications, Inc*., 970 F.3d 1010, 1020 (8th Cir. 2020) (quoting *Dataphase Sys*., 640 F.2d at 113.) This "requires a court to distinguish between weak or illusory injuries and very real threats of injuries." *Rodriguez v. Molina*, 608 F. Supp. 3d 791, 798 (S.D. Iowa 2022) (cleaned up). It considers harm to both the litigants and other interested parties, like the public. *Wachovia Sec., L.L.C. v. Stanton*, 571 F. Supp.

10

2d 1014, 1047 (N.D. Iowa 2008). The last factor, the public interest, "invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious." *Id.* at 1048.

## IV.    LEGAL ANALYSIS: STANDING.

### A.  *Legal Background.*

As a preliminary matter, the Court must decide whether: (a) the United States has standing to challenge Section 4[5] of Senate File 2340, which requires state court judges to enter orders requiring certain noncitizens to return to the foreign countries from which they came[6]; and (b) the Iowa MMJ Plaintiffs have standing to challenge any aspect of Senate File 2340. To establish standing, "a plaintiff must present a 'case' or 'controversy' within the meaning of Article III of the Constitution." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009). "This 'irreducible constitutional minimum of standing' requires a showing of 'injury in fact' to the plaintiff that is 'fairly traceable to the challenged action of the defendant,' and 'likely [to] be redressed by a favorable decision.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "Whether a plaintiff has shown such an injury 'often turns on the nature and source of the claim asserted.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). "[T]he question whether he has a cognizable injury sufficient to confer standing is closely bound up with the question of whether and how the law will grant him relief." *Id.*

### B.  *The United States Has Standing to Challenge Senate File 2340 in Its Entirety.*

Defendants argue that the United States lacks standing to challenge Section 4 because it imposes requirements on state court *judges*, none of whom are defendants. (United States Docket ECF 19, p. 18.)[7] To support their argument, Defendants rely on the Eighth Circuit's decision in *Digital Recognition Network, Inc. v. Hutchinson*, which involved a constitutional challenge to an Arkansas statute making it unlawful to use automatic license plate reader systems. 803 F.3d 952, 955 (8th Cir. 2015). The Arkansas statute was not enforceable by state or local prosecutors, but rather through private actions for damages. *Id.* at 958. The Eighth Circuit therefore held that the plaintiff did not have standing to sue the Arkansas Governor or Attorney General. *Id.* at 957–58.

---

[5] Codified at Iowa Code § 718C.4.

[6] Defendants concede that the United States has standing to challenge the portions of Senate File 2340 other than Section 4.

[7] All citations are to the page numbers in the upper righthand corner of each page, which are auto-populated by the electronic case filing system. These page numbers are often different than those placed by the parties at the bottom of each page.

Defendants are overreading *Digital Recognition Network*. Unlike a damages award in a private lawsuit under the Arkansas law, the judicial order contemplated by Section 4 only comes into effect if the Attorney General or a County Attorney pursues charges against someone under the criminal provisions of Senate File 2340. The United States' injury is therefore "fairly traceable" to these officials. *See id.* at 957 (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). In other words, there is a causal connection between the injury to the United States and the conduct of the Attorney General or County Attorney; the injury is not the "result of 'the independent action of some third party not before the court.'" *Id.* (quoting *Lujan*, 504 U.S. at 560); *see also Hawkeye Commodity Promotions, Inc. v. Miller*, 432 F. Supp. 2d 822, 835 (N.D. Iowa 2006) (concluding that statutory grant of discretion as to when to enforce a law gives attorney general "some connection with the enforcement" of state law), *aff'd sub nom. Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430 (8th Cir. 2007). There is nothing in *Digital Recognition Network* to suggest standing is absent in these circumstances; to the contrary, the Eighth Circuit has affirmed standing in analogous situations. *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011) ("When a statute is challenged as unconstitutional, the proper defendants are the officials whose role it is to administer and enforce the statute.").

 *C. The Iowa MMJ Plaintiffs Have Standing to Challenge Senate File 2340 in Its Entirety.*

Defendants also dispute the standing of the Iowa MMJ Plaintiffs, whom Defendants argue cannot challenge *any* aspect of Senate File 2340. Defendants argue that Plaintiffs Doe and Roe lack standing because they are lawful permanent residents to whom, in Defendants' view, Senate File 2340 does not apply. (Iowa MMJ Docket ECF 36, p. 17.) Similarly, Defendants argue that Iowa MMJ lacks direct or organizational standing because its Complaint merely identifies: (a) three Iowa MMJ members who are authorized to be in the United States, none of whom, according to Defendants, are at risk of injury if Senate File 2340 goes into effect; and (b) one member, identified as "David," for whom there is insufficient detail to plausibly establish the requirements for standing. (Id., p. 19.) Defendants also argue that Iowa MMJ lacks organizational standing because the diversion of resources the entity claims it will experience from the enactment of Senate File 2340 is self-inflicted and does not constitute an injury-in-fact. (Id., pp. 19–21.)

As to Plaintiffs Doe and Roe, Defendants' arguments revolve largely around the proper interpretation of Iowa Code § 718C.2(1), which makes it a criminal offense if "[a] person who is an alien . . . enters, attempts to enter, or is at any time found in this state under any of the following

circumstances: *a.* The person has been denied admission to or has been excluded, deported, or removed from the United States[;] *b.* The person has departed from the United States while an order of exclusion, deportation, or removal is outstanding." Defendants argue that criminal liability depends on the person's *current* immigration status and that the statute does not apply to someone who was previously deported or removed but is now lawfully in the United States.

Defendants' argument is difficult to square with the statutory language. Each of Plaintiffs Doe and Roe is an "alien[] . . . in this state . . . [who] has been denied admission to or has been excluded, deported, or removed from the United States." *Id*. In Doe's case, this occurred when she tried to reenter the United States after returning to Mexico following her mother's death in 2005; in Roe's case, it occurred when she was deported for failing to report to the immigration office in February 2017. There is no exception in § 718C.2(1) for an alien whose removal order has been waived or who otherwise has been granted permission to be in the country after previously having been "denied admission" or "excluded, deported, or removed." To the contrary, the statute's repeated and insistent use of the past tense—i.e., "denied," "excluded," "deported," and "removed"—indicates that a person will be criminally liable based on what happened in the past, not based on current legal status. Or, at least, this interpretation of the statute is plausible enough to give Doe and Roe standing, as it gives them a credible fear of prosecution. *See Ark. Right to Life State Pol. Action Comm. v. Butler*, 146 F.3d 558, 560 (8th Cir 1998) ("Plaintiffs, however, are not required to expose themselves to arrest or prosecution under a criminal statute in order to challenge a statute in federal court."); *see also Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979) (holding that standing existed even though criminal penalty provision had not yet been applied, as fear of prosecution was not "imaginary or wholly speculative" where provision "on its face" proscribed the proposed conduct and state "ha[d] not disavowed" any intention of invoking it).

Defendants urge the Court to avoid this problem by applying the principle that courts should "interpret a statute to avoid doubt as to its constitutionality." *Crowell v. State Pub. Def.*, 845 N.W.2d 676, 689 (Iowa 2014). To that end, Defendants argue that Iowa Code § 718C.2(1) was modeled after the federal illegal reentry statute, 8 U.S.C. § 1326(a), and therefore should be interpreted the same way. There is, however, a glaring problem with this argument. True, the federal and Iowa statutes start in the same place by making it a crime for an alien to be present after having been "denied admission, excluded, deported, or removed or ha[ving] departed the

13

United States while an order of exclusion, deportation, or removal is outstanding." The federal statute goes on, however, to state that a person has not committed the offense of illegal reentry if:

> (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act.

8 U.S.C. § 1326(a)(2). In other words, a person with lawful permanent resident status has a defense under federal law to the charge of illegal reentry. *See United States v. Sandoval-Gonzalez*, 642 F.3d 717, 724 (9th Cir. 2011). **But there is no comparable language in Iowa Code § 718C.2(1)**.

This difference between the Iowa and federal illegal reentry statutes is crucially important in two respects. First, as a matter of pure statutory interpretation, 8 U.S.C. § 1326(a)(1) and Iowa Code § 718C.2(1) both use the past tense to describe the circumstances that constitute illegal reentry; i.e., a person is guilty if the person is present or tries to reenter the country but "has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding." If, as Defendants argue, this language refers only to *current* immigration status despite the repeated use of the past tense, there would have been no reason for Congress to insert defenses into 8 U.S.C. § 1326(a)(2) for noncitizens with permanent legal status. The fact that Congress inserted those defenses therefore shows that it deliberately used the past tense in 8 U.S.C. § 1326(a)(1). It would be odd to conclude that the Iowa Legislature used the very same words in the very same (past) tense in Iowa Code § 718C.2(1) and yet was referring to *current* or *prevailing* legal status, present tense. Yet this is Defendants' argument: they want the Court to interpret the same words in the two statutes in two different ways. This is not a persuasive argument.

Second, and relatedly, given that the Iowa statute is modeled in every other way on the federal statute, the Court must give effect to the Iowa Legislature's conspicuous decision not to include the defenses that exist under federal law. *See State v. Iowa Dist. Ct. for Johnson Cnty.*, 730 N.W.2d 677, 679 (Iowa 2007) ("Statutory text may express legislative intent by omission as well as inclusion."). Indeed, the Iowa Supreme Court has recognized that when state and federal statutes address the same topic, differences between the two matter. *See, e.g.*, *EMC Ins. Grp. v. Shepard*, 960 N.W.2d 661, 672 (Iowa 2021) (refusing to apply federal law definition of key term in state statute; "such a change in the legislative definition must come from the legislature"); *MidAmerica*

*Sav. Bank v. Miehe*, 438 N.W.2d 837, 838 (Iowa 1989) (refusing to adopt federal standards where the Iowa Legislature "adopted federal law for some, but certainly not all, purposes" relating to the object of the legislation). The Iowa Supreme Court has similarly recognized that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Oyens Fees & Supply, Inc. v. Primebank*, 808 N.W.2d 186, 193 (Iowa 2011) (quoting *Chestnut v. Montgomery*, 307 F.3d 698, 701–02 (8th Cir. 2002)). Here, these principles of statutory construction dovetail and require the Court to conclude the Iowa Legislature was not trying to "mirror" federal illegal reentry law in every respect when it enacted Senate File 2340, but rather wanted to take Iowa's law in a different direction than federal law by removing defenses. *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply.").

The canon of constitutional avoidance allows the Court to "interpret the statute, not rewrite it." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018); *accord In re Det. Of Wygle*, 910 N.W.2d 599, 617 (Iowa 2018) ("If *fairly* possible, we will construe a statute to avoid doubt as to constitutionality." (emphasis added)). Here, Defendants want the Court to rewrite Senate File 2340 by interpreting the past tense to mean the present tense and add defenses the Iowa Legislature intentionally chose not to include. This the Court cannot do. *See Jennings*; 583 U.S. at 286; *United States v. Stevens*, 559 U.S. 460, 480–81 (2010).

There are other problems with Defendants' interpretation, too, including that their interpretation of § 718C.2(1) conflicts with their interpretation of § 718C.6, which prohibits a state court from abating the prosecution of an illegal reentry offense against someone even if a federal determination regarding the person's immigration status is pending or will be initiated. Defendants argue that because § 718C.6 only forbids abatement as to pending and yet-to-be-initiated federal determinations, the Iowa Legislature must have intended to *require* abatement when a federal determination is already final. (United States Docket ECF 28, pp. 43–44.) In other words, Defendants urge the Court to apply the doctrine of *expressio unius est exclusio alterius* to conclude that the Iowa Legislature created a "default rule" of abatement of prosecutions in § 718C.6 whenever the United States has given someone permanent legal status. But Defendants also argue that the Iowa Legislature did not intend for people with permanent legal status to be prosecuted

under § 718C.2(1) in the first place. It is difficult to understand why § 718C.6 would need to be interpreted to mandate prosecutorial abatement when there has been a final federal determination of someone's lawful status if § 718C.2(1) doesn't permit the arrest or prosecution of such a person at all. In these circumstances, Defendants are effectively admitting the problem they have with the plain language of § 718C.2(1), which applies to people previously "denied admission" or "excluded, deported, or removed" without regard to current status. This captures Doe and Roe.

Because Plaintiffs Doe and Roe satisfy the statutory language as written, they will "commit[] an offense" if they are "at any time found in this state. . . ." It follows that they have a credible fear of prosecution, and thus standing to challenge Senate File 2340. The Attorney General's promise not to prosecute people within Senate File 2340's plain language doesn't change this. *See Stevens*, 559 U.S. at 480 ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."). Indeed, although the Attorney General has the discretionary authority to get involved in local prosecutions, she cannot control the charging decisions made in the first instance by the ninety-nine County Attorneys in Iowa. *See* Iowa Code § 13.2(1)(b) (granting discretionary authority to the Attorney General to "[p]rosecute and defend . . . all actions and proceedings . . . in which the state may be a party or interested, when, in the attorney general's judgment, the interest of the state requires such action, or when requested to do so by the governor, executive council, or general assembly"). It follows that Doe and Roe have a credible fear of prosecution irrespective of how the Attorney General purports to interpret the law. *See St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006) (concluding that plaintiffs had credible fear of prosecution despite previous failure to enforce statute where county attorneys had "taken an oath" to enforce state law); *United Food & Com. Workers Int'l Union, AFL-CIO, CLC v. IBP, Inc*., 857 F.2d 422, 429 (8th Cir. 1988) (holding that standing existed even though state officials had no "present plan" to enforce statute because state's position "could well change"). Moreover, even as to the Attorney General, Senate File 2340 is so new that there is no longstanding "state policy" of non-enforcement that the Court could rely upon to conclude that Doe and Roe lack a credible fear of prosecution. *See Gaertner*, 439 F.3d at 486.

Once the standing of Doe and Roe is established, the standing of Plaintiff Iowa MMJ is established as well. "An association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are

germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). The association "need not establish that all of its members would have standing to sue individually so long as it can show that 'any one of them' would have standing." *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 869 (8th Cir. 2013) (quoting *Warth*, 422 U.S. at 511), *enforced sub nom. Iowa League of Cities v. Env't Prot. Agency*, No. 11-3412, 2021 WL 6102534 (8th Cir. Dec. 22, 2021).

The first and third requirements for organizational standing are satisfied because Doe and Roe have standing, and Iowa MMJ seeks "only declaratory and prospective injunctive relief," which makes participation by individual members unnecessary. *See Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 533 (8th Cir. 2005). The second requirement—whether the "interests at stake are germane to the organization's purpose"—is also satisfied because Doe's and Roe's right to remain in Iowa as lawful residents goes to the heart of Iowa MMJ's work. *See, e.g.*, *Miss. Coal. for Env't v. FERC*, 544 F.3d 955, 957 (8th Cir. 2008) (where organization's mission was preserving the environment, organization had standing to challenge action that increased risk of environmental harm). (*See also* Iowa MMJ Docket ECF 9-5, ¶ 4.) Therefore, Iowa MMJ has standing based on its members Doe and Roe.

Although David is not separately named as a plaintiff, he nonetheless gives Iowa MMJ an alternative basis for standing because the Complaint alleges sufficient facts to plausibly establish that David would have standing in his own right. The Complaint alleges that David is an Iowa MMJ member who was deported but returned to the United States shortly after removal to care for his mother and sister. (Iowa MMJ Docket ECF 1, ¶ 14.) The Complaint further states that he graduated from high school in Iowa in 2007 and is at risk of being arrested for violating Senate File 2340. (Id., ¶ 60.) In context, these allegations are fairly read to mean David is in Iowa given that he: (a) graduated from high school here; (b) is an Iowa MMJ Member; (c) asserts a fear of arrest for violating Senate File 2340, which could only occur if he is in Iowa (or intends to try to enter); and (d) never claims to reside anywhere else. David therefore has a credible fear of prosecution under Senate File 2340. *See Babbitt*, 442 U.S. at 302. Moreover, unlike Doe and Roe, both of whom are legally present in the United States under federal law, David does not allege lawful permanent resident status, and thus he is at risk of prosecution even under Defendants' proffered interpretation of Senate File 2340's illegal reentry provisions. *See id.*

For these reasons, the Court concludes that Plaintiffs Doe and Roe have individual standing and Plaintiff Iowa MMJ has organizational standing. It is unnecessary for the Court to decide whether Iowa MMJ has standing based on the impact of Senate File 2340 on its own resources.

## V.   LEGAL ANALYSIS: *DATAPHASE* FACTORS.

### A.   *Plaintiffs Are Likely to Succeed on the Merits.*

#### 1.   The United States Has a Viable Cause of Action in Equity.

Turning to the merits, Defendants argue, first, that the United States has failed to state a viable claim because the Supremacy Clause does not create a cause of action where none otherwise would exist. (United States Docket ECF 19, p. 17.) This argument emanates from *Armstrong v. Exceptional Child Center, Inc.*, in which health care providers sued state officials in Idaho for allegedly violating federal law by setting reimbursement rates too low for services covered by Medicaid. 575 U.S. 320, 323–24 (2015). The Supreme Court held that the providers had no cause of action under the Supremacy Clause, nor could they proceed in equity. *Id.* at 327, 329.

Defendants' reliance on *Armstrong* is unpersuasive. Three years before *Armstrong*, the Supreme Court decided *Arizona v. United States*, holding that federal immigration laws preempted an Arizona law imposing criminal penalties for immigration-related offenses and authorizing state officials to investigate and make arrests for immigration violations. 567 U.S. 387 (2012). The United States initiated *Arizona* by suing Arizona officials in equity for violating the Supremacy Clause. *Id.* at 393. Defendants' argument here, if accepted, would mean the Supreme Court unnecessarily reached the merits in *Arizona* and should have concluded the United States did not have a cause of action in the first place. In other words, Defendants' position is that the Supreme Court missed a threshold and outcome-determinative issue.

Defendants are misinterpreting *Armstrong*. Although it held that the Supremacy Clause does not independently create a cause of action, *Armstrong* also reaffirmed the well-established principle that equity will provide such a cause of action in appropriate circumstances. *Id.* at 327–28. Those circumstances did not exist in *Armstrong* because the relevant statute reflected Congress's intent to foreclose equitable relief. *Id.* There is nothing in *Armstrong* to suggest, however, that the United States cannot bring a cause of action in equity to try to establish federal preemption of state law. *Id.* To the contrary, both before and after *Armstrong*, courts have consistently entertained lawsuits brought by the United States in equity to enjoin a state law based on the Supremacy Clause. *See, e.g.*, *United States v. Washington*, 596 U.S. 832 (2022); *United*

*States v. California*, 921 F.3d 865, 876 (9th Cir. 2019); *United States v. South Carolina*, 720 F.3d 518, 523–24 (4th Cir. 2013); *United States v. Alabama*, 691 F.3d 1269, 1279 (11th Cir. 2012); *see also United States v. Texas*, 557 F. Supp. 3d 810, 820 (W.D. Tex. 2021) ("[T]he United States has brought many lawsuits under the Supremacy Clause in the years since *Armstrong* without any questioning of the Supremacy Clause as the basis for a federal cause of action.") As Defendants have not cited a single case to the contrary, the Court has little difficulty rejecting their position that the United States has not stated a viable cause of action.

2. <u>Plaintiffs Are Likely to Prevail in Arguing that Federal Immigration Laws Preempt Senate File 2340.</u>

The next question is whether the United States and Iowa MMJ Plaintiffs are likely to succeed on their preemption arguments. The Western District of Texas (Ezra, J.) recently analyzed this issue in the context of a Texas law, S.B. 4, that contains similar language to Senate File 2340. *See United States v. Texas*, --- F. Supp. 3d ----, 2024 WL 861526 (W.D. Tex. Feb. 29, 2024). The United States Court of Appeals for the Fifth Circuit has not yet issued a final decision on appeal from Judge Ezra's ruling, but it did issue an extensive interlocutory ruling denying Texas's request for a stay of enforcement of the injunction. *See United States v. Texas*, 97 F.4th 268 (5th Cir. 2024). Both the Fifth Circuit and Judge Ezra concluded that S.B. 4 is likely unconstitutional on preemption grounds under *Arizona*, 567 U.S. 387. This Court finds their analysis persuasive and equally applicable to Senate File 2340.

In *Arizona*, the Arizona Legislature enacted a law that created two new immigration-related criminal offenses, one for failure to comply with federal alien-registration requirements and the other for seeking or engaging in work in Arizona as an unauthorized alien. 567 U.S. at 393–94. The law also contained provisions giving state and local law enforcement officers the authority to make warrantless arrests of people believed to be removable from the United States and to make a "reasonable attempt . . . to determine the immigration status" of any person stopped, detained, or arrested, if "reasonable suspicion exists that the person is an alien and is unlawfully present in the United States." *Id.* at 407, 411. The Supreme Court held that the two new criminal provisions were preempted by federal law and therefore properly enjoined. *Id.* at 403, 407. It further held that the provision authorizing state and local law enforcement officers to make warrantless arrests of people suspected of being removable was also preempted by federal law and properly enjoined. *Id.* at 410. It reversed the entry of injunctive relief, however, as to the provision requiring state and local law enforcement officers to investigate the immigration status of anyone they arrest if there

is reasonable suspicion that the person is in the country unlawfully, holding that "[t]here is a basic uncertainty about what the law means and how it will be enforced. At this stage, without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume [the law] will be construed in a way that creates a conflict with federal law." *Id.* at 415.

Unlike Senate File 2340 (and S.B. 4 in Texas), the Arizona law at issue in *Arizona* did not impose state criminal penalties for the crime of illegal reentry. The Arizona law did, however, "replicate[]" federal alien-registration laws by "add[ing] a state-law penalty for conduct proscribed by federal law." *Id.* at 400, 403. The Supreme Court held that Arizona was preempted from doing so because Congress fully occupied the field of alien registration, leaving no room for additional state regulation. *Id.* at 401. It did not matter that the Arizona law "ha[d] the same aim as federal law and adopt[ed] its substantive standards" because "States may not enter, in any respect, an area the Federal Government has reserved for itself." *Id.* at 402.

The Fifth Circuit and Judge Ezra concluded that the Supreme Court's logic applies with equal force to state law attempts to criminalize illegal reentry. *See Texas*, 97 F.4th at 279–82; *Texas*, 2024 WL 861526, at *11–18. The Fifth Circuit explained that "Congress enacted the Immigration and Nationality Act (INA) to establish a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and to set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Id.* at 279–80 (quoting *DeCanas v. Bica*, 424 U.S. 351, 353, 359 (1976)). S.B. 4 interfered with this comprehensive federal scheme by criminalizing behavior "already prohibited by the INA." *Id.* at 280. According to the Fifth Circuit, this is just as problematic in the context of illegal reentry as it is in the context of the alien-registration statute at issue in *Arizona*; in both places, "[p]ermitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted." *Id.* (quoting *Arizona*, 567 U.S. at 402).

In arguing otherwise, Defendants try to distinguish *Arizona* by pointing out that the Arizona law criminalized alien-registration violations that were not criminal offenses under federal law. The Arizona law therefore went further than federal law. Like the Fifth Circuit and Judge Ezra, however, the Court concludes that there is no reasonable way to interpret *Arizona* as forbidding state law attempts to criminalize alien registration violations but allowing state law attempts to criminalize illegal reentry. The underlying problem is the same in either context: Congress "left no room" for state regulation because such regulation would "frustrate federal

20

policies" and interfere with the comprehensive scheme established under federal law. *See Arizona*, 567 U.S. at 399, 402; *see Texas*, 97 F.4th at 279–86. It follows that Senate File 2340 is field preempted. *See Texas*, 97 F.4th at 286 (holding that the federal government has occupied the "entire field of unlawful entry and reentry of noncitizens as well as removal" (internal punctuation omitted)).

*Arizona* would compel this conclusion irrespective of whether there are substantive differences between the criminal provisions of Senate File 2340 and the federal illegal reentry statute because field preemption makes any such differences irrelevant. Nonetheless, it is worth noting that Senate File 2340 also would be preempted under principles of conflict preemption, which "exists where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Pharm. Rsch. & Mfgrs. of Am. v. McClain*, 95 F.4th 1136, 1140 (8th Cir. 2024) (quoting *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015)). Here, under federal law, people like Plaintiffs Doe and Roe are not criminally liable for illegal reentry because, although they were previously removed from the United States, they later obtained permanent legal status and thus now have a meritorious defense to an illegal reentry charge. *See* 8 U.S.C. § 1326(a)(2). By contrast, under Iowa Code § 718C.2(1), permanent legal status is not a defense, and thus Doe and Roe have criminal exposure. Meaning: the State of Iowa can arrest them and put them in jail for something the United States has given them permission to do. This is untenable. *See Texas*, 2024 WL 861526, at *21 (holding that S.B. 4 "plainly conflicts with federal law by instructing state judges to disregard pending federal defenses"); *see also South Carolina*, 720 F.3d at 530 ("In essence, [state law] operate[s] to criminalize unlawful presence, a stance plainly at odds with federal law.").

Equally untenable is the fact that Senate File 2340 prohibits state court judges from abating prosecutions for illegal reentry while the person being prosecuted seeks relief under federal law. *See* Iowa Code § 718C.6 ("A court may not abate the prosecution of an offense under this chapter on the basis that a federal determination regarding the immigration status of the person is pending or will be initiated."). The point is clear: Senate File 2340 does not permit federal immigration law to run its course. Under principles of conflict preemption, this violates the Supremacy Clause. *See Texas*, 97 F.4th at 291 (giving state judges power to make removal decisions without notice to or consent from the federal government "conflict[s] with federal law" and "sidesteps the sensitive issues that federal immigration officers are to consider")

The fact that Senate File 2340 compels Iowa state court judges to issue orders requiring noncitizens to return to the foreign nation from which they came makes the conflict preemption problem even worse. *See* Iowa Code § 718C.4(4). Congress has established an intricate and specialized system, with multiple layers of review by trained immigration officials and judges, for determining when someone can be removed from this country and where they must go. *See Texas*, 97 F.4th at 284–85. Importantly, noncitizens are not always returned to the foreign nation from which they came; instead, there are sometimes national security, border security, or foreign affairs reasons for sending them elsewhere. *See Jama*, 543 U.S. at 348. By contrast, Senate File 2340 recognizes none of this nuance and instead bluntly requires state court judges to order aliens to leave the United States and return to the foreign nation from which they came. Again, this creates an untenable dichotomy between federal and state law in an area where the Supreme Court has recognized that the United States must speak with a single, harmonious voice. *See Texas*, 97 F.4th at 291 (recognizing it "significantly conflict[s]" with federal law when state court judges are permitted to select the countries to which noncitizens will be removed).

Although it would not matter to the outcome, the Court is not persuaded by Defendants' argument that Iowa Code § 718C.4(4) merely requires Iowa state court judges to perform a "ministerial" function. There is nothing "ministerial" about issuing an order "requiring the person to return to the foreign nation from which the person entered or attempted to enter," particularly when noncompliance with the order is punishable by imprisonment. *See Texas*, 2024 WL 861526, at *15–16 (rejecting Texas's position that removal order was not a true "removal" and concluding instead that such orders are an "especially problematic intrusion on federal prerogatives"). Indeed, Senate File 2340 even requires the state court judge to identify the "manner of transportation of the person to a port of entry" and the "law enforcement officer or state agency responsible for monitoring compliance with the order." Iowa Code § 718C.4(5). This is for all intents and purposes an order of removal, except that it: (i) is issued by judges who have no training or experience with the nuances of the removal process (not that Iowa Code § 718C.4(4) allows any nuance anyway); (ii) does not contain the safeguards that are present under federal law; and (iii) makes no attempt to account for the complexities associated with deciding whether to remove someone and to where.

The bottom line is that Senate File 2340 is preempted by federal law under principles of both field and conflict preemption. *See Arizona*, 567 U.S. at 409 ("[T]he removal process is

entrusted to the discretion of the Federal Government."). The United States and Iowa MMJ Plaintiffs are therefore likely to prevail on their claims under the Supremacy Clause.[8]

3.   The Remaining *Dataphase* Factors Weigh in Favor of Injunctive Relief.

Because the likelihood of success factor is the most important to determining whether to award injunctive relief, *see Carson*, 978 F.3d at 1059, the Court's analysis of the merits goes a long way toward making such relief appropriate. Nonetheless, the Court also will analyze the other three *Dataphase* factors: threat of irreparable harm, balance of harms, and public interest. *See Sleep No. Corp.*, 33 F.4th at 1016 (listing factors).

As to irreparable harm, some courts have held that "Supremacy Clause violations trigger a presumption of irreparable harm," *see United States v. Idaho*, 623 F. Supp. 3d 1096, 1115 (D. Idaho 2022), or that the "United States has shown irreparable harm as a matter of law" in such circumstances, *Texas*, 2024 WL 861526, at *38. The parties have not cited—nor has the Court independently located—an Eighth Circuit case using such strong language, and thus the Court will not treat irreparable harm as automatic or even presumed when the United States shows a likelihood of success on preemption. Nonetheless, persuasive authority recognizes that the United States clearly would suffer *some* level of significant harm when a state tries to enforce its own immigration laws that are likely preempted by federal law. *See, e.g.*, *South Carolina*, 720 F.3d at 533; *Alabama*, 691 F.3d at 1301 ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."). This makes sense: the whole point of field preemption, in particular, is that the federal regulatory scheme is "so pervasive . . . that Congress left no room for the States to supplement it." *Arizona*, 567 U.S. at 399 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

In the context of Senate File 2340, the potential harms include, *inter alia*: (a) permanent legal residents facing a risk of prosecution and criminal punishment under state law despite having permission under federal law to be present in the United States; (b) state court prosecutions for illegal reentry moving forward even when defendants are in the process of applying for legal status under federal law; (c) untrained state court judges entering orders requiring noncitizens to leave the United States following an adjudicatory process with fewer safeguards and far less

---

[8] Because the United States and Iowa MMJ Plaintiffs are likely to prevail on their claims under the Supremacy Clause, the Court need not address their likelihood of prevailing under the Foreign Commerce Clause. *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (plaintiff must only establish a likelihood of success on "any one of" its claims).

sophistication than the federal system; (d) state court judges requiring noncitizens to return to countries where they might not be accepted or might face persecution or torture, in violation of federal laws and treaties; (e) noncitizens being delivered to a port of entry with no clear mechanism for what happens next; and (f) corresponding impacts on international relations and foreign affairs. Collectively, these harms are significant enough to make the threat of irreparable harm factor weigh in favor of injunctive relief as to both the United States and Iowa MMJ Plaintiffs. *See Texas*, 2024 WL 861526, at *38–40; *see also South Carolina*, 720 F.3d at 533 ("The irreparable injury to the nation's foreign policy if the relevant sections take effect has been clearly established by the United States. And for individual, unlawfully present immigrants and others, the likelihood of chaos resulting from South Carolina enforcing its separate immigration regime is apparent.").

Regarding the balance of harms and public interest factors, the Eighth Circuit has held that they "drop from the case" altogether if a plaintiff establishes preemption and irreparable harm. *Bank One v. Guttau*, 190 F.3d 844, 847–48 (8th Cir. 1999) ("[The party challenging the state legislation] will be entitled to injunctive relief no matter what the harm to the State, and the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law."). More recently, the Eighth Circuit has held that those two factors "merge" when the party opposing the injunction is a state official acting in his or her official capacity. *See Eggers v. Evnen*, 48 F.4th 561, 564–65 (8th Cir. 2022). In an abundance of caution, the Court will not disregard the balance of harm and public interest factors altogether, but rather will follow *Eggers v. Evnen* by treating them as one-and-the-same.

The crucial question is whose interest prevails in a situation where the United States and State of Iowa are on opposite sides of the case, as both sides can credibly claim injury to the public when they are enjoined from executing their respective laws as they see fit. *See Texas*, 97 F.4th at 295–96 (recognizing that both the United States and Texas face potential irreparable harm). The Fifth Circuit held that in the areas of immigration and foreign affairs, it is the *federal* interest that prevails, as "state and local interests are subservient to those of the nation at large." *Id.* at 296 (citing *Hines v. Davidowitz*, 312 U.S. 52, 63–64 (1941)). The Fourth and Eleventh Circuits agree. *See Alabama*, 691 F.3d at 1301 ("[W]e discern no harm from the state's nonenforcement of invalid legislation."); *South Carolina*, 720 F.3d at 533 (affirming entry of preliminary injunction). This Court finds these cases persuasive and therefore concludes that the "merged" balance of harm and

public interest factors weigh in favor of injunctive relief when, as here, the state law is likely preempted by federal law. *See also Guttau*, 190 F.3d at 847–48.

This conclusion does not change even if, as Defendants argue, Senate File 2340 should be interpreted the same way as federal law. In that scenario, Iowa is not trying to enforce any unique interest, but rather is trying to help (or, one might say, to *compel*) the United States to carry out federal immigration laws. The federal interest remains just as paramount in this circumstance as it would be if the federal and state laws diverged. *See Arizona*, 567 U.S. at 401 ("Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards.").

In sum, the *Dataphase* factors weigh in favor of injunctive relief for both the United States and Iowa MMJ Plaintiffs as to the provisions of Senate File 2340 making illegal reentry a state law crime, requiring state court judges to enter orders requiring noncitizens to leave, and forbidding the abatement of state criminal prosecutions even when defendants have initiated or intend to initiate federal proceedings to establish lawful status. Because Defendants admit these provisions cannot be severed from the remaining aspects of Senate File 2340 (*see* United States Docket ECF 28, p. 51), the Court concludes that the *Dataphase* factors weigh in favor of preliminary injunctive relief as to Senate File 2340 as a whole.

## VI.   CONCLUSION.

The United States and Iowa MMJ Plaintiffs have established a likelihood of success on the merits of their position that federal immigration law preempts Senate File 2340 under both conflict and field preemption. For this reason, and because the remaining preliminary injunction factors also weigh in favor of injunctive relief, the Court GRANTS the motions for preliminary injunction filed by the United States and Iowa MMJ Plaintiffs in their respective cases. Defendants are hereby ENJOINED from enforcing Senate File 2340 pending further proceedings.

**IT IS SO ORDERED.**

Dated: June 17, 2024

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE

**Add. 25**

Appellate Case: 24-2265   Page: 27   Date Filed: 07/24/2024 Entry ID: 5416842

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | |
| vs. | | Case No. 4:24-cv-00162-SHL-SBJ |
| STATE OF IOWA; KIMBERLY REYNOLDS, in her official capacity as Governor of the State of Iowa; BRENNA BIRD, in her official capacity as Attorney General of the State of Iowa; IOWA DEPARTMENT OF PUBLIC SAFETY; and STEPHAN K. BAYENS, in his official capacity as Commissioner of Iowa Department of Public Safety, | | **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IOWA MIGRANT MOVEMENT FOR JUSTICE; JANE DOE; and ELIZABETH ROE, | | |
| Plaintiffs, | | |
| vs. | | Case No. 4:24-cv-00161-SHL-SBJ |
| BRENNA BIRD, in her official capacity as Attorney General of the State of Iowa; KIMBERLY GRAHAM, in her official capacity as Polk County Attorney; and ZACH HERRMANN, in his official capacity as Clayton County Attorney, | | **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | | |

1

**Add. 26**

## I.    INTRODUCTION.

Dissatisfied with how the United States Government is handling immigration, the Iowa Legislature decided to take matters into its own hands by enacting new legislation (known as Senate File 2340) that, among other things: (i) imposes criminal penalties under state law for certain immigration-related offenses; and (ii) requires state court judges to order noncitizens to return to the foreign countries from which they came. As a matter of politics, the new legislation might be defensible. As a matter of constitutional law, it is not. Under binding Supreme Court precedent, Senate File 2340 is preempted in its entirety by federal law and thus is invalid under the Supremacy Clause. The Court therefore GRANTS the motions for preliminary injunction filed by Plaintiffs in these related cases and ENJOINS the enforcement of Senate File 2340 pending further proceedings.

## II.    BACKGROUND.

### A.  Senate File 2340.

On April 10, 2024, Iowa Governor Kim Reynolds signed into law Senate File 2340, which adds Chapter 718C to the Iowa Code. The law goes into effect on July 1, 2024, and creates two new criminal offenses under Iowa law. The first, codified at Iowa Code § 718C.2(1), states:

> 1. A person who is an alien commits an offense if the person enters, attempts to enter, or is at any time found in this state under any of the following circumstances:
>
>     a.   The person has been denied admission to or has been excluded, deported, or removed from the United States.
>     b.   The person has departed from the United States while an order of exclusion, deportation, or removal is outstanding.

Iowa Code § 718C.1(1) defines "alien" to "mean[] the same as defined in 8 U.S.C. § 1101, as of January 1, 2023." As of January 1, 2023, "alien" was defined as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).[1] A violation of § 718C.2(1) is generally an aggravated misdemeanor, although it can be a class "C" or "D" felony if the person has qualifying prior convictions or satisfies other conditions. *See id.* § 718C.2(2).

The second new criminal offense is codified at § 718C.5(1), which states:

> 1. A person who is an alien commits an offense if all of the following are true:

---

[1] The definition of "alien" remains the same today.

> > *a.*    The person has been charged with or convicted of an offense under this chapter.
> > *b.*    A judge has issued an order under this chapter for the person to return to the foreign nation from which the person entered or attempted to enter.
> > *c.*    The person failed to comply with the order.

A violation of § 718C.5(1) is a class "C" felony. *Id.* § 718C.5(2).

Following a person's initial appearance on the charge of violating §§ 718C.2(1) or 718C.5(1), a state court judge is permitted to issue a written order "discharg[ing] the person and requir[ing] the person to return to the foreign nation from which the person entered or attempted to enter…." *Id.* § 718C.4(3). Such an order is permitted only with the person's consent, and only if the person has not been previously convicted of an offense under Chapter 718C. *Id.* If a person charged with an offense under Chapter 718 does *not* consent to an order requiring them to return to the foreign nation, the State may continue with the prosecution under §§ 718C.2(1) or 718C.5(1). *Id.* Section 718C.6 states: "A court may not abate the prosecution of an offense under this chapter on the basis that a federal determination regarding the immigration status of the person is pending or will be initiated."

"Upon a person's conviction of an offense under [Chapter 718C], the judge shall enter in the judgment in the case an order requiring the person to return to the foreign nation from which the person entered or attempted to enter. An order issued under this subsection takes effect on completion of the term of confinement or imprisonment imposed by the judgment." *Id.* § 718C.4(4). Such an order must identify the "manner of transportation of the person to a port of entry" and the "law enforcement officer or state agency responsible for monitoring compliance with the order." *Id.* § 718C.4(5). Iowa Code § 718C.1(2) defines "port of entry" to "mean[] a port of entry in the United States as designated by 19 C.F.R. pt. 101." According to the Code of Federal Regulations, there are two ports of entry in Iowa: the Des Moines International Airport and Quad Cities International Airport. *See* 19 C.F.R. § 101.3.[2]

> *B.    The Iowa Migrant Movement for Justice Plaintiffs.*

Plaintiff Iowa Migrant Movement for Justice ("Iowa MMJ") is a statewide membership-based legal service and advocacy organization headquartered in Des Moines, Iowa. (Iowa MMJ

---

[2] The Quad Cities International Airport is actually in Moline, Illinois, and thus it appears that the Code of Federal Regulations is inaccurate. This is not material to the outcome here.

Add. 28

Docket[3] ECF 9-5, ¶ 3.) Its legal staff provides immigration representation and consultations to noncitizens, advising over 2,400 clients in 2023. (Id., ¶¶ 6, 9.) Iowa MMJ's advocates seek to improve immigrants' lives in four ways, through issue campaigns, narrative change, coalition building, and civic engagement. (Id., ¶¶ 10–15.) Erica Johnson, Iowa MMJ's founding executive director, asserts that Senate File 2340 will frustrate Iowa MMJ's ability to keep providing services. (Id., ¶¶ 2, 25, 36.) She explains that Senate File 2340 will require Iowa MMJ to expand their intake process to analyze potential state criminal prosecution for immigration offenses, which will divert legal staff's attention away from other priorities and toward things like helping clients fill out Freedom of Information Act requests to compile a full immigration profile, which wasn't previously required. (Id., ¶¶ 27, 29.) As a result, Iowa MMJ won't be able to serve as many clients and its grant funding, which requires Iowa MMJ to meet specific deliverables, may be jeopardized. (Id., ¶ 25.) Iowa MMJ's legal staff also will need to analyze Senate File 2340's effect on past clients and defend clients against prosecution in state court, which, again, will pull resources away from current projects. (Id., ¶¶ 30–31.) Iowa MMJ's new focus on these areas will impede its ability to represent lawful permanent residents in their naturalization applications, help those with DACA renew their status, and represent Afghan evacuees, all of which are currently among Iowa MMJ's "core" services. (Id., ¶¶ 25, 35.)

According to Johnson, Iowa MMJ's advocacy work has already changed to accommodate Senate File 2340. (Id., ¶ 36.) Before the bill passed, staff devoted significant resources to opposing it. (Id., ¶ 37.) After it was enacted, staff started educating the community about its consequences. (Id., ¶ 38.) When staff are fielding calls from members about the bill and preparing fact sheets and arranging speakers to discuss Senate File 2340, they can't engage in grassroots efforts or traditional outreach activities, both of which are "core" advocacy functions. (Id., ¶¶ 39–41.) Johnson expects Senate File 2340 to continue to frustrate Iowa MMJ's advocacy goals even after the public is educated; for example, the law will break down community bonds and damage other relationships Iowa MMJ has worked for years to cultivate. (Id., ¶ 43.)

Plaintiffs Jane Doe and Elizabeth Roe are members of Iowa MMJ. (Id., ¶¶ 23–24.) Doe is a lawful permanent resident of the United States and citizen of Mexico. (Iowa MMJ Docket ECF 9-3, ¶ 2.) She is a 68-year-old widow with five children and seventeen grandchildren. (Id.) She has never been convicted of a crime. (Id., ¶ 3.) In 2000, Doe and her children came to the United States

---

[3] All references to the "Iowa MMJ Docket" are to the electronic case filings in Case No. 4:24-cv-00161.

to reunite with her husband, who was a United States citizen. (Id., ¶¶ 5, 9.) In 2005, she returned to Mexico after her mother passed away. (Id., ¶ 10.) When Doe tried to reenter the United States a few months later, she was stopped by immigration officials, detained for about half a day, and sent back to Mexico. (Id.) She was issued a removal order. (Id.)

Because Doe's husband had U.S. citizenship, he was able to file a petition for her to return to the United States. (Id., ¶ 12.) However, he died before it was approved. (Id.) After his death, the petition was converted to a widow petition and eventually approved, with her prior removal order being waived. (Id., ¶¶ 13–15.) As a result of the approval, Doe obtained a green card and became a lawful permanent resident. (Id., ¶¶ 14–15.) She settled in Garnavillo, Iowa, because two of her daughters live in Iowa for work. (Id., ¶ 16.) She is using the pseudonym "Jane Doe" because she is scared of being prosecuted under the law and removed to Mexico. (Id., ¶ 17.) She also wants to avoid the stress and anxiety of having her name made public. (Id., ¶ 20.)

Roe is a lawful permanent resident of the United States and citizen of Columbia. (Iowa MMJ Docket ECF 9-4, ¶ 2.) She is forty years old and married to a United States citizen. (Id.) She has never been convicted of a crime. (Id., ¶ 3.) She came to the United States for the first time in September 2016 to reunite with her brothers, both of whom are United States citizens. (Id., ¶ 6.) Immigration officials detained her at the border for twenty-four hours and gave her an expedited removal order. (Id., ¶ 7.) However, they released her from custody and allowed her to go to Iowa, subject to the requirement that she report to the immigration office every month. (Id.) In February 2017, Roe was deported for missing a reporting date. (Id., ¶¶ 8–9.) She married her husband in Columbia in April 2018, and he applied for her to obtain a green card and return to the United States to live with him. (Id., ¶ 10.) Her prior removal order was waived as part of the green card application process, and the application was eventually approved. (Id., ¶¶ 11, 13.) She returned to the United States as a lawful permanent resident in May 2023. (Id., ¶ 13.) She now lives in Des Moines, Iowa. (Id., ¶ 4.) She is using the pseudonym "Elizabeth Roe" because she is afraid of the consequences of her true name becoming public. (Id., ¶ 16.)

C. *Potential Impacts of Senate File 2340 on Federal Immigration Laws and International Relations.*

The United States submitted three Declarations regarding the impact of Senate File 2340. The first is from Eric Jacobstein, who is employed by the United States Department of State as

Add. 30

Deputy Assistant Secretary in the Bureau of Western Hemisphere Affairs. (United States Docket[4] ECF 7-2, ¶ 1.) According to Jacobstein, Senate File 2340 threatens to harm United States foreign relations in four ways: (1) it antagonizes foreign governments; (2) it threatens to undermine the federal government's comprehensive policy framework for addressing regional irregular migration; (3) it is inconsistent with the United States' treaty obligations; and (4) it risks reciprocal and retaliatory treatment of United States citizens abroad. (Id., ¶ 8.)

As it relates to animosity with foreign governments, Jacobstein says the Mexican government has already expressed concerns about SF 2340 in public statements and during meetings with State Department and White House officials. (Id., ¶ 11.) The Mexican government expressed similar concerns with a recent bill enacted in Texas, known as "S.B. 4," which has considerable overlap with Senate File 2340. (Id., ¶ 12.) Like S.B. 4, Jacobstein says one of the challenges with Senate File 2340 is that it permits Iowa state judges to order removal of a person to the country from which the person entered, without knowing whether the person is a citizen of that country or if that country will accept them. (Id., ¶ 13.) This will "frustrate the United States' relations with other countries regarding noncitizen removals and likely other important bilateral issues." (Id.) According to Jacobstein, Senate File 2340 also affects the efficacy of federal actions to secure the border and stem irregular migration. (Id., ¶ 15.) He says that "[d]iplomatic discussions concerning migration are delicate and cannot be successful if the government does not speak with one voice." (Id., ¶ 16.)

As it relates to comprehensive foreign policy strategy, Jacobstein says the United States "must establish long-term strategic partnerships with the governments in the [North and Central American] region to catalyze structural change to root out corruption and impunity, improve security and the rule of law, and increase economic opportunity." (Id., ¶ 18.) The United States has used an executive order, Executive Order 14010, to "outline[] a comprehensive foreign-policy framework to collaboratively manage migration." (Id., ¶ 19.) This has resulted in cooperative strategies with foreign governments like Mexico. (Id., ¶¶ 19–21.) These strategies are designed, among other things, to strengthen asylum systems and regularization programs in countries other than the United States. (Id., ¶ 22.) Jacobstein says Senate File 2340 undermines these efforts because it is inconsistent with the United States' treaty obligations and therefore damages the country's credibility. (Id., ¶¶ 23–24.)

---

[4] All references to "United States Docket" are to the electronic case filing system in Case No. 4:24-cv-00162.

Add. 31

Appellate Case: 24-2265    Page: 33    Date Filed: 07/24/2024 Entry ID: 5416842

Speaking of treaty obligations, Jacobstein says Senate File 2340 is inconsistent with the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (the "Convention Against Torture"), which prohibits the return of noncitizens to countries where they face torture. (Id., ¶ 25.) Similarly, under the 1967 United Nations Protocol Relating to the Status of Refugees (the "Refugee Protocol"), noncitizens may be entitled to withholding of removal if they will face persecution in the country to which they would be returned on the basis of race, religion, nationality, membership in a particular social group, or political opinion. (Id.) Jacobstein points out that Senate File 2340 contains no exception for an individual who fears persecution or torture and therefore could result in "refoulement," which occurs when a noncitizen is constructively or actually forced to return to a place where the noncitizen will face persecution or torture. (Id., ¶¶ 26–27.) Not only would this potentially violate the United States' treaty obligations, it also would compromise the United States' credibility in negotiations with foreign governments on the same and similar issues. (Id., ¶¶ 28–29.)

Finally, Jacobstein says Senate File 2340 will create a risk of reciprocal and retaliatory treatment of United States citizens at home and abroad. (Id., ¶ 30.) For example, he points out that Russia passed a law in 2012 banning the adoption of Russian children by United States citizens in retaliation for the United States passing a law designed to punish Russian officials for the death of a Russian prisoner. (Id.) Jacobstein reiterates that "it is critically important that national immigration policy be governed by a uniform legal regime, and that decisions regarding the development and enforcement of immigration policy be made by the federal government, so that the United States can speak to the world with one voice." (Id., ¶ 32.)

The United States' second Declaration is from Ted Kim, the Associate Director of the Refugee, Asylum and International Operations ("RAIO") Directorate within the U.S. Citizenship and Immigration Services ("USCIS"), U.S. Department of Homeland Security ("DHS"). (United States Docket ECF 7-3, ¶ 1.) Kim's Declaration focuses on the asylum application process in the United States, which is a detailed and comprehensive process designed to ensure that noncitizens are not returned to countries where they may be tortured or persecuted. (Id., ¶¶ 4–8.) Federal asylum laws and regulations are designed, among other things, to satisfy the United States' obligations under the nonrefoulement provisions of the Convention Against Torture and Refugee Protocol. (Id., ¶¶ 4–5.) Asylum applications can be filed proactively by noncitizens to USCIS or defensively in removal proceedings before the Department of Justice's Executive Office for

Add. 32

Immigration Review ("EOIR"). (Id., ¶ 6.) Either way, specially trained federal officials and judges evaluate whether the noncitizen has a credible fear of persecution or torture. (Id., ¶¶ 14–15.) According to Kim, Senate File 2340 "does not appear to have any of the safeguards in place for asylum applicants, or for noncitizens seeking withholding of removal or protection under the Convention Against Torture that are available under U.S. law." (Id., ¶ 16.) Accordingly, in his view, Senate File 2340 will impact potential and actual asylum applicants, as well as noncitizens applying for statutory withholding from removal and protection under the Convention Against Torture. (Id., ¶ 17.) "Furthermore, noncitizens detained under SF 2340, or removed from the United States, would be unable to participate fully in federal immigration proceedings," thus potentially impacting the outcome of those proceedings. (Id., ¶ 18.)

The United States' third and final Declaration is from Russell Hott, the Deputy Executive Associate Director of DHS, United States Immigration and Customs Enforcement ("ICE"), and Enforcement and Removal Operations ("ERO"). (United States Docket ECF 7-4, ¶ 1.) ICE is responsible for enforcing more than 400 federal statutes, and its mission includes removing noncitizens who lack lawful immigration status or are otherwise removable under federal law. (Id., ¶ 6.) For non-detained individuals alone, ICE manages a docket of more than 7.2 million cases. (Id., ¶ 7.) There are over 6,000 immigration officers employed by ERO, plus another 6,100 Special Agents employed by ICE's law enforcement component, Homeland Security Investigations. (Id., ¶ 8.) Effective November 29, 2021, the Secretary of Homeland Security issued Department-wide guidance prioritizing DHS's limited law enforcement resources on the apprehension and removal of noncitizens who threaten national security, public safety, and border security. (Id., ¶¶ 9–10.) Hott's Declaration summarizes the removal process under the Immigration and Nationality Act, which involve due process protections, multiple avenues for relief, and several layers of review by immigration judges and Article III judges. (Id., ¶¶ 11–17.) Hott says that Senate File 2340 "does not appear to ensure comparable procedures," but rather requires state court judges to proceed with prosecutions under Iowa Code Chapter 718C even if federal proceedings are pending or may be initiated. (Id., ¶ 18.)

According to Hott, as of April 14, 2024, ICE has almost 5,000 cases involving a final order of removal for a person with a last claimed address in Iowa. (Id., ¶ 19.) In addition, ERO has more than 23,000 cases involving non-detained noncitizens who provided a last claimed address in Iowa. (Id.) If Iowa imposes criminal penalties for unlawful reentry by noncitizens, it might lead those

citizens to depart Iowa for other states, thus straining ICE's resources to try to find them. (Id., ¶ 20.) Moreover, Hott says Iowa has not identified a mechanism for effectuating and verifying the return of noncitizens to the country from which they entered, thus creating the risk of potential confusion and strained relationships. (Id., ¶ 21.) The immigration laws passed by Iowa and other states, if allowed to go into effect, will create "a piecemeal system of immigration" and force the federal government to "navigate an impossible patchwork of regulations affecting the enforcement of federal law." (Id., ¶ 22.)

   *D. Procedural Posture.*

   On May 9, 2024, the Iowa MMJ Plaintiffs filed their Complaint for Declaratory and Injunctive Relief against Iowa Attorney General Brenna Bird, Polk County Attorney Kimberly Graham, and Clayton County Attorney Zach Herrmann. (Iowa MMJ Docket ECF 1.) Later the same day, the United States filed its Complaint against the State of Iowa, Iowa Governor Kim Reynolds, Iowa Attorney General Bird, the Iowa Department of Public Safety, and Iowa Department of Public Safety Commissioner Stephan Bayens. (United States Docket ECF 1.) Both the Iowa MMJ Plaintiffs and United States seek a declaratory judgment and preliminary and permanent injunctive relief enjoining the enforcement of Senate File 2340. On May 10, 2024, the Iowa MMJ Plaintiffs formally moved for a preliminary injunction, supported by declarations. (Iowa MMJ Docket ECF 9.) The United States followed suit three days later, also supported by declarations. (United States Docket ECF 7.) In the Iowa MMJ Case, Defendants Graham and Herrmann have agreed to comply with any injunction the Court might enter but otherwise have agreed with the Iowa MMJ Plaintiffs to a stay. (Iowa MMJ Docket ECF 26, ECF 33.) All other Defendants resist the motions for preliminary injunction. (Iowa MMJ Docket ECF 36; United States Docket ECF 19.) These Defendants did not submit declarations or present other factual evidence; rather, they resist the motions for preliminary injunction entirely on legal grounds. (For simplicity, this Order will use the term "Defendants" or the "State" to refer to all Defendants other than Graham and Herrmann.)

   The Court has not formally consolidated the two cases. In the interest of efficiency, however, the Court did hold a single hearing on the two motions for preliminary injunction. The Court is likewise issuing this single ruling to address both motions, although the unique features of each case will be discussed where relevant below.

### III.     PRELIMINARY INJUNCTION STANDARD.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Tumey v. Mycroft AI, Inc*., 27 F.4th 657, 664 (8th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "[T]he burden of establishing the propriety of an injunction is on the movant." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021). The Court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (alteration in original) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc*., 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). "While no single factor is determinative, the probability of success factor is the most significant. *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (cleaned up). For actions that seek to enjoin the enforcement of a duly enacted state statute, the moving parties must show that they are likely to prevail on their claims. *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1000 (8th Cir. 2019). This is a higher standard than applies in other preliminary injunction cases. *See id*. "We apply a heightened standard in such instances because the duly enacted state statute constitutes government action based on presumptively reasoned democratic processes, and such action is entitled to a higher degree of deference and should not be enjoined lightly." *Id*. (internal punctuation and citation omitted).

With respect to the remaining three factors, a plaintiff "is not required to prove with certainty the threat of irreparable harm, but it must prove that 'irreparable injury is likely in the absence of an injunction.'" *Sleep No. Corp.*, 33 F.4th at 1018 (quoting *Winter*, 555 U.S. at 22). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "In balancing the equities, [the Court] weigh[s] 'the threat of irreparable harm' shown by the movant against 'the injury that granting the injunction will inflict on other parties litigant.'" *MPAY Inc. v. Erie Custom Comput. Applications, Inc*., 970 F.3d 1010, 1020 (8th Cir. 2020) (quoting *Dataphase Sys*., 640 F.2d at 113.) This "requires a court to distinguish between weak or illusory injuries and very real threats of injuries." *Rodriguez v. Molina*, 608 F. Supp. 3d 791, 798 (S.D. Iowa 2022) (cleaned up). It considers harm to both the litigants and other interested parties, like the public. *Wachovia Sec., L.L.C. v. Stanton*, 571 F. Supp.

2d 1014, 1047 (N.D. Iowa 2008). The last factor, the public interest, "invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious." *Id*. at 1048.

## IV.   LEGAL ANALYSIS: STANDING.

### A.   *Legal Background.*

As a preliminary matter, the Court must decide whether: (a) the United States has standing to challenge Section 4[5] of Senate File 2340, which requires state court judges to enter orders requiring certain noncitizens to return to the foreign countries from which they came[6]; and (b) the Iowa MMJ Plaintiffs have standing to challenge any aspect of Senate File 2340. To establish standing, "a plaintiff must present a 'case' or 'controversy' within the meaning of Article III of the Constitution." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009). "This 'irreducible constitutional minimum of standing' requires a showing of 'injury in fact' to the plaintiff that is 'fairly traceable to the challenged action of the defendant,' and 'likely [to] be redressed by a favorable decision.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "Whether a plaintiff has shown such an injury 'often turns on the nature and source of the claim asserted.'" *Id*. (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). "[T]he question whether he has a cognizable injury sufficient to confer standing is closely bound up with the question of whether and how the law will grant him relief." *Id*.

### B.   *The United States Has Standing to Challenge Senate File 2340 in Its Entirety.*

Defendants argue that the United States lacks standing to challenge Section 4 because it imposes requirements on state court *judges*, none of whom are defendants. (United States Docket ECF 19, p. 18.)[7] To support their argument, Defendants rely on the Eighth Circuit's decision in *Digital Recognition Network, Inc. v. Hutchinson*, which involved a constitutional challenge to an Arkansas statute making it unlawful to use automatic license plate reader systems. 803 F.3d 952, 955 (8th Cir. 2015). The Arkansas statute was not enforceable by state or local prosecutors, but rather through private actions for damages. *Id.* at 958. The Eighth Circuit therefore held that the plaintiff did not have standing to sue the Arkansas Governor or Attorney General. *Id.* at 957–58.

---

[5] Codified at Iowa Code § 718C.4.
[6] Defendants concede that the United States has standing to challenge the portions of Senate File 2340 other than Section 4.
[7] All citations are to the page numbers in the upper righthand corner of each page, which are auto-populated by the electronic case filing system. These page numbers are often different than those placed by the parties at the bottom of each page.

11

Defendants are overreading *Digital Recognition Network.* Unlike a damages award in a private lawsuit under the Arkansas law, the judicial order contemplated by Section 4 only comes into effect if the Attorney General or a County Attorney pursues charges against someone under the criminal provisions of Senate File 2340. The United States' injury is therefore "fairly traceable" to these officials. *See id.* at 957 (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). In other words, there is a causal connection between the injury to the United States and the conduct of the Attorney General or County Attorney; the injury is not the "result of 'the independent action of some third party not before the court.'" *Id.* (quoting *Lujan*, 504 U.S. at 560); *see also Hawkeye Commodity Promotions, Inc. v. Miller*, 432 F. Supp. 2d 822, 835 (N.D. Iowa 2006) (concluding that statutory grant of discretion as to when to enforce a law gives attorney general "some connection with the enforcement" of state law), *aff'd sub nom. Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430 (8th Cir. 2007). There is nothing in *Digital Recognition Network* to suggest standing is absent in these circumstances; to the contrary, the Eighth Circuit has affirmed standing in analogous situations. *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011) ("When a statute is challenged as unconstitutional, the proper defendants are the officials whose role it is to administer and enforce the statute.").

   *C. The Iowa MMJ Plaintiffs Have Standing to Challenge Senate File 2340 in Its Entirety.*

   Defendants also dispute the standing of the Iowa MMJ Plaintiffs, whom Defendants argue cannot challenge *any* aspect of Senate File 2340. Defendants argue that Plaintiffs Doe and Roe lack standing because they are lawful permanent residents to whom, in Defendants' view, Senate File 2340 does not apply. (Iowa MMJ Docket ECF 36, p. 17.) Similarly, Defendants argue that Iowa MMJ lacks direct or organizational standing because its Complaint merely identifies: (a) three Iowa MMJ members who are authorized to be in the United States, none of whom, according to Defendants, are at risk of injury if Senate File 2340 goes into effect; and (b) one member, identified as "David," for whom there is insufficient detail to plausibly establish the requirements for standing. (Id., p. 19.) Defendants also argue that Iowa MMJ lacks organizational standing because the diversion of resources the entity claims it will experience from the enactment of Senate File 2340 is self-inflicted and does not constitute an injury-in-fact. (Id., pp. 19–21.)

   As to Plaintiffs Doe and Roe, Defendants' arguments revolve largely around the proper interpretation of Iowa Code § 718C.2(1), which makes it a criminal offense if "[a] person who is an alien . . . enters, attempts to enter, or is at any time found in this state under any of the following

circumstances: *a.* The person has been denied admission to or has been excluded, deported, or removed from the United States[;] *b.* The person has departed from the United States while an order of exclusion, deportation, or removal is outstanding." Defendants argue that criminal liability depends on the person's *current* immigration status and that the statute does not apply to someone who was previously deported or removed but is now lawfully in the United States.

Defendants' argument is difficult to square with the statutory language. Each of Plaintiffs Doe and Roe is an "alien[] . . . in this state . . . [who] has been denied admission to or has been excluded, deported, or removed from the United States." *Id*. In Doe's case, this occurred when she tried to reenter the United States after returning to Mexico following her mother's death in 2005; in Roe's case, it occurred when she was deported for failing to report to the immigration office in February 2017. There is no exception in § 718C.2(1) for an alien whose removal order has been waived or who otherwise has been granted permission to be in the country after previously having been "denied admission" or "excluded, deported, or removed." To the contrary, the statute's repeated and insistent use of the past tense—i.e., "denied," "excluded," "deported," and "removed"—indicates that a person will be criminally liable based on what happened in the past, not based on current legal status. Or, at least, this interpretation of the statute is plausible enough to give Doe and Roe standing, as it gives them a credible fear of prosecution. *See Ark. Right to Life State Pol. Action Comm. v. Butler*, 146 F.3d 558, 560 (8th Cir 1998) ("Plaintiffs, however, are not required to expose themselves to arrest or prosecution under a criminal statute in order to challenge a statute in federal court."); *see also Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979) (holding that standing existed even though criminal penalty provision had not yet been applied, as fear of prosecution was not "imaginary or wholly speculative" where provision "on its face" proscribed the proposed conduct and state "ha[d] not disavowed" any intention of invoking it).

Defendants urge the Court to avoid this problem by applying the principle that courts should "interpret a statute to avoid doubt as to its constitutionality." *Crowell v. State Pub. Def.*, 845 N.W.2d 676, 689 (Iowa 2014). To that end, Defendants argue that Iowa Code § 718C.2(1) was modeled after the federal illegal reentry statute, 8 U.S.C. § 1326(a), and therefore should be interpreted the same way. There is, however, a glaring problem with this argument. True, the federal and Iowa statutes start in the same place by making it a crime for an alien to be present after having been "denied admission, excluded, deported, or removed or ha[ving] departed the

13

United States while an order of exclusion, deportation, or removal is outstanding." The federal statute goes on, however, to state that a person has not committed the offense of illegal reentry if:

> (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act.

8 U.S.C. § 1326(a)(2). In other words, a person with lawful permanent resident status has a defense under federal law to the charge of illegal reentry. *See United States v. Sandoval-Gonzalez*, 642 F.3d 717, 724 (9th Cir. 2011). **But there is no comparable language in Iowa Code § 718C.2(1)**.

This difference between the Iowa and federal illegal reentry statutes is crucially important in two respects. <u>First</u>, as a matter of pure statutory interpretation, 8 U.S.C. § 1326(a)(1) and Iowa Code § 718C.2(1) both use the past tense to describe the circumstances that constitute illegal reentry; i.e., a person is guilty if the person is present or tries to reenter the country but "has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding." If, as Defendants argue, this language refers only to *current* immigration status despite the repeated use of the past tense, there would have been no reason for Congress to insert defenses into 8 U.S.C. § 1326(a)(2) for noncitizens with permanent legal status. The fact that Congress inserted those defenses therefore shows that it deliberately used the past tense in 8 U.S.C. § 1326(a)(1). It would be odd to conclude that the Iowa Legislature used the very same words in the very same (past) tense in Iowa Code § 718C.2(1) and yet was referring to *current* or *prevailing* legal status, present tense. Yet this is Defendants' argument: they want the Court to interpret the same words in the two statutes in two different ways. This is not a persuasive argument.

<u>Second</u>, and relatedly, given that the Iowa statute is modeled in every other way on the federal statute, the Court must give effect to the Iowa Legislature's conspicuous decision not to include the defenses that exist under federal law. *See State v. Iowa Dist. Ct. for Johnson Cnty.*, 730 N.W.2d 677, 679 (Iowa 2007) ("Statutory text may express legislative intent by omission as well as inclusion."). Indeed, the Iowa Supreme Court has recognized that when state and federal statutes address the same topic, differences between the two matter. *See, e.g.*, *EMC Ins. Grp. v. Shepard*, 960 N.W.2d 661, 672 (Iowa 2021) (refusing to apply federal law definition of key term in state statute; "such a change in the legislative definition must come from the legislature"); *MidAmerica*

14

*Sav. Bank v. Miehe*, 438 N.W.2d 837, 838 (Iowa 1989) (refusing to adopt federal standards where the Iowa Legislature "adopted federal law for some, but certainly not all, purposes" relating to the object of the legislation). The Iowa Supreme Court has similarly recognized that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Oyens Fees & Supply, Inc. v. Primebank*, 808 N.W.2d 186, 193 (Iowa 2011) (quoting *Chestnut v. Montgomery*, 307 F.3d 698, 701–02 (8th Cir. 2002)). Here, these principles of statutory construction dovetail and require the Court to conclude the Iowa Legislature was not trying to "mirror" federal illegal reentry law in every respect when it enacted Senate File 2340, but rather wanted to take Iowa's law in a different direction than federal law by removing defenses. *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply.").

The canon of constitutional avoidance allows the Court to "interpret the statute, not rewrite it." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018); *accord In re Det. Of Wygle*, 910 N.W.2d 599, 617 (Iowa 2018) ("If *fairly* possible, we will construe a statute to avoid doubt as to constitutionality." (emphasis added)). Here, Defendants want the Court to rewrite Senate File 2340 by interpreting the past tense to mean the present tense and add defenses the Iowa Legislature intentionally chose not to include. This the Court cannot do. *See Jennings*; 583 U.S. at 286; *United States v. Stevens*, 559 U.S. 460, 480–81 (2010).

There are other problems with Defendants' interpretation, too, including that their interpretation of § 718C.2(1) conflicts with their interpretation of § 718C.6, which prohibits a state court from abating the prosecution of an illegal reentry offense against someone even if a federal determination regarding the person's immigration status is pending or will be initiated. Defendants argue that because § 718C.6 only forbids abatement as to pending and yet-to-be-initiated federal determinations, the Iowa Legislature must have intended to *require* abatement when a federal determination is already final. (United States Docket ECF 28, pp. 43–44.) In other words, Defendants urge the Court to apply the doctrine of *expressio unius est exclusio alterius* to conclude that the Iowa Legislature created a "default rule" of abatement of prosecutions in § 718C.6 whenever the United States has given someone permanent legal status. But Defendants also argue that the Iowa Legislature did not intend for people with permanent legal status to be prosecuted

15

under § 718C.2(1) in the first place. It is difficult to understand why § 718C.6 would need to be interpretated to mandate prosecutorial abatement when there has been a final federal determination of someone's lawful status if § 718C.2(1) doesn't permit the arrest or prosecution of such a person at all. In these circumstances, Defendants are effectively admitting the problem they have with the plain language of § 718C.2(1), which applies to people previously "denied admission" or "excluded, deported, or removed" without regard to current status. This captures Doe and Roe.

Because Plaintiffs Doe and Roe satisfy the statutory language as written, they will "commit[] an offense" if they are "at any time found in this state. . . ." It follows that they have a credible fear of prosecution, and thus standing to challenge Senate File 2340. The Attorney General's promise not to prosecute people within Senate File 2340's plain language doesn't change this. *See Stevens*, 559 U.S. at 480 ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."). Indeed, although the Attorney General has the discretionary authority to get involved in local prosecutions, she cannot control the charging decisions made in the first instance by the ninety-nine County Attorneys in Iowa. *See* Iowa Code § 13.2(1)(b) (granting discretionary authority to the Attorney General to "[p]rosecute and defend . . . all actions and proceedings . . . in which the state may be a party or interested, when, in the attorney general's judgment, the interest of the state requires such action, or when requested to do so by the governor, executive council, or general assembly"). It follows that Doe and Roe have a credible fear of prosecution irrespective of how the Attorney General purports to interpret the law. *See St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006) (concluding that plaintiffs had credible fear of prosecution despite previous failure to enforce statute where county attorneys had "taken an oath" to enforce state law); *United Food & Com. Workers Int'l Union, AFL-CIO, CLC v. IBP, Inc.*, 857 F.2d 422, 429 (8th Cir. 1988) (holding that standing existed even though state officials had no "present plan" to enforce statute because state's position "could well change"). Moreover, even as to the Attorney General, Senate File 2340 is so new that there is no longstanding "state policy" of non-enforcement that the Court could rely upon to conclude that Doe and Roe lack a credible fear of prosecution. *See Gaertner*, 439 F.3d at 486.

Once the standing of Doe and Roe is established, the standing of Plaintiff Iowa MMJ is established as well. "An association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are

germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc*., 528 U.S. 167, 181 (2000). The association "need not establish that all of its members would have standing to sue individually so long as it can show that 'any one of them' would have standing." *Iowa League of Cities v. E.P.A*., 711 F.3d 844, 869 (8th Cir. 2013) (quoting *Warth*, 422 U.S. at 511), *enforced sub nom. Iowa League of Cities v. Env't Prot. Agency*, No. 11-3412, 2021 WL 6102534 (8th Cir. Dec. 22, 2021).

The first and third requirements for organizational standing are satisfied because Doe and Roe have standing, and Iowa MMJ seeks "only declaratory and prospective injunctive relief," which makes participation by individual members unnecessary. *See Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 533 (8th Cir. 2005). The second requirement—whether the "interests at stake are germane to the organization's purpose"—is also satisfied because Doe's and Roe's right to remain in Iowa as lawful residents goes to the heart of Iowa MMJ's work. *See, e.g.*, *Miss. Coal. for Env't v. FERC*, 544 F.3d 955, 957 (8th Cir. 2008) (where organization's mission was preserving the environment, organization had standing to challenge action that increased risk of environmental harm). (*See also* Iowa MMJ Docket ECF 9-5, ¶ 4.) Therefore, Iowa MMJ has standing based on its members Doe and Roe.

Although David is not separately named as a plaintiff, he nonetheless gives Iowa MMJ an alternative basis for standing because the Complaint alleges sufficient facts to plausibly establish that David would have standing in his own right. The Complaint alleges that David is an Iowa MMJ member who was deported but returned to the United States shortly after removal to care for his mother and sister. (Iowa MMJ Docket ECF 1, ¶ 14.) The Complaint further states that he graduated from high school in Iowa in 2007 and is at risk of being arrested for violating Senate File 2340. (Id., ¶ 60.) In context, these allegations are fairly read to mean David is in Iowa given that he: (a) graduated from high school here; (b) is an Iowa MMJ Member; (c) asserts a fear of arrest for violating Senate File 2340, which could only occur if he is in Iowa (or intends to try to enter); and (d) never claims to reside anywhere else. David therefore has a credible fear of prosecution under Senate File 2340. *See Babbitt*, 442 U.S. at 302. Moreover, unlike Doe and Roe, both of whom are legally present in the United States under federal law, David does not allege lawful permanent resident status, and thus he is at risk of prosecution even under Defendants' proffered interpretation of Senate File 2340's illegal reentry provisions. *See id.*

For these reasons, the Court concludes that Plaintiffs Doe and Roe have individual standing and Plaintiff Iowa MMJ has organizational standing. It is unnecessary for the Court to decide whether Iowa MMJ has standing based on the impact of Senate File 2340 on its own resources.

## V.   LEGAL ANALYSIS: *DATAPHASE* FACTORS.

### A.   *Plaintiffs Are Likely to Succeed on the Merits.*

#### 1.   The United States Has a Viable Cause of Action in Equity.

Turning to the merits, Defendants argue, first, that the United States has failed to state a viable claim because the Supremacy Clause does not create a cause of action where none otherwise would exist. (United States Docket ECF 19, p. 17.) This argument emanates from *Armstrong v. Exceptional Child Center, Inc.*, in which health care providers sued state officials in Idaho for allegedly violating federal law by setting reimbursement rates too low for services covered by Medicaid. 575 U.S. 320, 323–24 (2015). The Supreme Court held that the providers had no cause of action under the Supremacy Clause, nor could they proceed in equity. *Id.* at 327, 329.

Defendants' reliance on *Armstrong* is unpersuasive. Three years before *Armstrong*, the Supreme Court decided *Arizona v. United States*, holding that federal immigration laws preempted an Arizona law imposing criminal penalties for immigration-related offenses and authorizing state officials to investigate and make arrests for immigration violations. 567 U.S. 387 (2012). The United States initiated *Arizona* by suing Arizona officials in equity for violating the Supremacy Clause. *Id.* at 393. Defendants' argument here, if accepted, would mean the Supreme Court unnecessarily reached the merits in *Arizona* and should have concluded the United States did not have a cause of action in the first place. In other words, Defendants' position is that the Supreme Court missed a threshold and outcome-determinative issue.

Defendants are misinterpreting *Armstrong*. Although it held that the Supremacy Clause does not independently create a cause of action, *Armstrong* also reaffirmed the well-established principle that equity will provide such a cause of action in appropriate circumstances. *Id.* at 327–28. Those circumstances did not exist in *Armstrong* because the relevant statute reflected Congress's intent to foreclose equitable relief. *Id.* There is nothing in *Armstrong* to suggest, however, that the United States cannot bring a cause of action in equity to try to establish federal preemption of state law. *Id.* To the contrary, both before and after *Armstrong*, courts have consistently entertained lawsuits brought by the United States in equity to enjoin a state law based on the Supremacy Clause. *See, e.g.*, *United States v. Washington*, 596 U.S. 832 (2022); *United*

18

*States v. California*, 921 F.3d 865, 876 (9th Cir. 2019); *United States v. South Carolina*, 720 F.3d 518, 523–24 (4th Cir. 2013); *United States v. Alabama*, 691 F.3d 1269, 1279 (11th Cir. 2012); *see also United States v. Texas*, 557 F. Supp. 3d 810, 820 (W.D. Tex. 2021) ("[T]he United States has brought many lawsuits under the Supremacy Clause in the years since *Armstrong* without any questioning of the Supremacy Clause as the basis for a federal cause of action.") As Defendants have not cited a single case to the contrary, the Court has little difficulty rejecting their position that the United States has not stated a viable cause of action.

      2.   <u>Plaintiffs Are Likely to Prevail in Arguing that Federal Immigration Laws Preempt Senate File 2340.</u>

      The next question is whether the United States and Iowa MMJ Plaintiffs are likely to succeed on their preemption arguments. The Western District of Texas (Ezra, J.) recently analyzed this issue in the context of a Texas law, S.B. 4, that contains similar language to Senate File 2340. *See United States v. Texas*, --- F. Supp. 3d ----, 2024 WL 861526 (W.D. Tex. Feb. 29, 2024). The United States Court of Appeals for the Fifth Circuit has not yet issued a final decision on appeal from Judge Ezra's ruling, but it did issue an extensive interlocutory ruling denying Texas's request for a stay of enforcement of the injunction. *See United States v. Texas*, 97 F.4th 268 (5th Cir. 2024). Both the Fifth Circuit and Judge Ezra concluded that S.B. 4 is likely unconstitutional on preemption grounds under *Arizona*, 567 U.S. 387. This Court finds their analysis persuasive and equally applicable to Senate File 2340.

      In *Arizona*, the Arizona Legislature enacted a law that created two new immigration-related criminal offenses, one for failure to comply with federal alien-registration requirements and the other for seeking or engaging in work in Arizona as an unauthorized alien. 567 U.S. at 393–94. The law also contained provisions giving state and local law enforcement officers the authority to make warrantless arrests of people believed to be removable from the United States and to make a "reasonable attempt . . . to determine the immigration status" of any person stopped, detained, or arrested, if "reasonable suspicion exists that the person is an alien and is unlawfully present in the United States." *Id.* at 407, 411. The Supreme Court held that the two new criminal provisions were preempted by federal law and therefore properly enjoined. *Id.* at 403, 407. It further held that the provision authorizing state and local law enforcement officers to make warrantless arrests of people suspected of being removable was also preempted by federal law and properly enjoined. *Id.* at 410. It reversed the entry of injunctive relief, however, as to the provision requiring state and local law enforcement officers to investigate the immigration status of anyone they arrest if there

is reasonable suspicion that the person is in the country unlawfully, holding that "[t]here is a basic uncertainty about what the law means and how it will be enforced. At this stage, without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume [the law] will be construed in a way that creates a conflict with federal law." *Id.* at 415.

Unlike Senate File 2340 (and S.B. 4 in Texas), the Arizona law at issue in *Arizona* did not impose state criminal penalties for the crime of illegal reentry. The Arizona law did, however, "replicate[]" federal alien-registration laws by "add[ing] a state-law penalty for conduct proscribed by federal law." *Id.* at 400, 403. The Supreme Court held that Arizona was preempted from doing so because Congress fully occupied the field of alien registration, leaving no room for additional state regulation. *Id.* at 401. It did not matter that the Arizona law "ha[d] the same aim as federal law and adopt[ed] its substantive standards" because "States may not enter, in any respect, an area the Federal Government has reserved for itself." *Id.* at 402.

The Fifth Circuit and Judge Ezra concluded that the Supreme Court's logic applies with equal force to state law attempts to criminalize illegal reentry. *See Texas*, 97 F.4th at 279–82; *Texas*, 2024 WL 861526, at *11–18. The Fifth Circuit explained that "Congress enacted the Immigration and Nationality Act (INA) to establish a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and to set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Id.* at 279–80 (quoting *DeCanas v. Bica*, 424 U.S. 351, 353, 359 (1976)). S.B. 4 interfered with this comprehensive federal scheme by criminalizing behavior "already prohibited by the INA." *Id.* at 280. According to the Fifth Circuit, this is just as problematic in the context of illegal reentry as it is in the context of the alien-registration statute at issue in *Arizona*; in both places, "[p]ermitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted." *Id.* (quoting *Arizona*, 567 U.S. at 402).

In arguing otherwise, Defendants try to distinguish *Arizona* by pointing out that the Arizona law criminalized alien-registration violations that were not criminal offenses under federal law. The Arizona law therefore went further than federal law. Like the Fifth Circuit and Judge Ezra, however, the Court concludes that there is no reasonable way to interpret *Arizona* as forbidding state law attempts to criminalize alien registration violations but allowing state law attempts to criminalize illegal reentry. The underlying problem is the same in either context: Congress "left no room" for state regulation because such regulation would "frustrate federal

**Add. 45**

policies" and interfere with the comprehensive scheme established under federal law. *See Arizona*, 567 U.S. at 399, 402; *see Texas*, 97 F.4th at 279–86. It follows that Senate File 2340 is field preempted. *See Texas*, 97 F.4th at 286 (holding that the federal government has occupied the "entire field of unlawful entry and reentry of noncitizens as well as removal" (internal punctuation omitted)).

*Arizona* would compel this conclusion irrespective of whether there are substantive differences between the criminal provisions of Senate File 2340 and the federal illegal reentry statute because field preemption makes any such differences irrelevant. Nonetheless, it is worth noting that Senate File 2340 also would be preempted under principles of conflict preemption, which "exists where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Pharm. Rsch. & Mfgrs. of Am. v. McClain*, 95 F.4th 1136, 1140 (8th Cir. 2024) (quoting *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015)). Here, under federal law, people like Plaintiffs Doe and Roe are not criminally liable for illegal reentry because, although they were previously removed from the United States, they later obtained permanent legal status and thus now have a meritorious defense to an illegal reentry charge. *See* 8 U.S.C. § 1326(a)(2). By contrast, under Iowa Code § 718C.2(1), permanent legal status is not a defense, and thus Doe and Roe have criminal exposure. Meaning: the State of Iowa can arrest them and put them in jail for something the United States has given them permission to do. This is untenable. *See Texas*, 2024 WL 861526, at *21 (holding that S.B. 4 "plainly conflicts with federal law by instructing state judges to disregard pending federal defenses"); *see also South Carolina*, 720 F.3d at 530 ("In essence, [state law] operate[s] to criminalize unlawful presence, a stance plainly at odds with federal law.").

Equally untenable is the fact that Senate File 2340 prohibits state court judges from abating prosecutions for illegal reentry while the person being prosecuted seeks relief under federal law. *See* Iowa Code § 718C.6 ("A court may not abate the prosecution of an offense under this chapter on the basis that a federal determination regarding the immigration status of the person is pending or will be initiated."). The point is clear: Senate File 2340 does not permit federal immigration law to run its course. Under principles of conflict preemption, this violates the Supremacy Clause. *See Texas*, 97 F.4th at 291 (giving state judges power to make removal decisions without notice to or consent from the federal government "conflict[s] with federal law" and "sidesteps the sensitive issues that federal immigration officers are to consider")

21

**Add. 46**

The fact that Senate File 2340 compels Iowa state court judges to issue orders requiring noncitizens to return to the foreign nation from which they came makes the conflict preemption problem even worse. *See* Iowa Code § 718C.4(4). Congress has established an intricate and specialized system, with multiple layers of review by trained immigration officials and judges, for determining when someone can be removed from this country and where they must go. *See Texas*, 97 F.4th at 284–85. Importantly, noncitizens are not always returned to the foreign nation from which they came; instead, there are sometimes national security, border security, or foreign affairs reasons for sending them elsewhere. *See Jama*, 543 U.S. at 348. By contrast, Senate File 2340 recognizes none of this nuance and instead bluntly requires state court judges to order aliens to leave the United States and return to the foreign nation from which they came. Again, this creates an untenable dichotomy between federal and state law in an area where the Supreme Court has recognized that the United States must speak with a single, harmonious voice. *See Texas*, 97 F.4th at 291 (recognizing it "significantly conflict[s]" with federal law when state court judges are permitted to select the countries to which noncitizens will be removed).

Although it would not matter to the outcome, the Court is not persuaded by Defendants' argument that Iowa Code § 718C.4(4) merely requires Iowa state court judges to perform a "ministerial" function. There is nothing "ministerial" about issuing an order "requiring the person to return to the foreign nation from which the person entered or attempted to enter," particularly when noncompliance with the order is punishable by imprisonment. *See Texas*, 2024 WL 861526, at *15–16 (rejecting Texas's position that removal order was not a true "removal" and concluding instead that such orders are an "especially problematic intrusion on federal prerogatives"). Indeed, Senate File 2340 even requires the state court judge to identify the "manner of transportation of the person to a port of entry" and the "law enforcement officer or state agency responsible for monitoring compliance with the order." Iowa Code § 718C.4(5). This is for all intents and purposes an order of removal, except that it: (i) is issued by judges who have no training or experience with the nuances of the removal process (not that Iowa Code § 718C.4(4) allows any nuance anyway); (ii) does not contain the safeguards that are present under federal law; and (iii) makes no attempt to account for the complexities associated with deciding whether to remove someone and to where.

The bottom line is that Senate File 2340 is preempted by federal law under principles of both field and conflict preemption. *See Arizona*, 567 U.S. at 409 ("[T]he removal process is

Add. 47

entrusted to the discretion of the Federal Government."). The United States and Iowa MMJ Plaintiffs are therefore likely to prevail on their claims under the Supremacy Clause.[8]

### 3.   The Remaining *Dataphase* Factors Weigh in Favor of Injunctive Relief.

Because the likelihood of success factor is the most important to determining whether to award injunctive relief, *see Carson*, 978 F.3d at 1059, the Court's analysis of the merits goes a long way toward making such relief appropriate. Nonetheless, the Court also will analyze the other three *Dataphase* factors: threat of irreparable harm, balance of harms, and public interest. *See Sleep No. Corp.*, 33 F.4th at 1016 (listing factors).

As to irreparable harm, some courts have held that "Supremacy Clause violations trigger a presumption of irreparable harm," *see United States v. Idaho*, 623 F. Supp. 3d 1096, 1115 (D. Idaho 2022), or that the "United States has shown irreparable harm as a matter of law" in such circumstances, *Texas*, 2024 WL 861526, at *38. The parties have not cited—nor has the Court independently located—an Eighth Circuit case using such strong language, and thus the Court will not treat irreparable harm as automatic or even presumed when the United States shows a likelihood of success on preemption. Nonetheless, persuasive authority recognizes that the United States clearly would suffer *some* level of significant harm when a state tries to enforce its own immigration laws that are likely preempted by federal law. *See, e.g.*, *South Carolina*, 720 F.3d at 533; *Alabama*, 691 F.3d at 1301 ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."). This makes sense: the whole point of field preemption, in particular, is that the federal regulatory scheme is "so pervasive . . . that Congress left no room for the States to supplement it." *Arizona*, 567 U.S. at 399 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

In the context of Senate File 2340, the potential harms include, *inter alia*: (a) permanent legal residents facing a risk of prosecution and criminal punishment under state law despite having permission under federal law to be present in the United States; (b) state court prosecutions for illegal reentry moving forward even when defendants are in the process of applying for legal status under federal law; (c) untrained state court judges entering orders requiring noncitizens to leave the United States following an adjudicatory process with fewer safeguards and far less

---

[8] Because the United States and Iowa MMJ Plaintiffs are likely to prevail on their claims under the Supremacy Clause, the Court need not address their likelihood of prevailing under the Foreign Commerce Clause. *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (plaintiff must only establish a likelihood of success on "any one of" its claims).

**Add. 48**

sophistication than the federal system; (d) state court judges requiring noncitizens to return to countries where they might not be accepted or might face persecution or torture, in violation of federal laws and treaties; (e) noncitizens being delivered to a port of entry with no clear mechanism for what happens next; and (f) corresponding impacts on international relations and foreign affairs. Collectively, these harms are significant enough to make the threat of irreparable harm factor weigh in favor of injunctive relief as to both the United States and Iowa MMJ Plaintiffs. *See Texas*, 2024 WL 861526, at *38–40; *see also South Carolina*, 720 F.3d at 533 ("The irreparable injury to the nation's foreign policy if the relevant sections take effect has been clearly established by the United States. And for individual, unlawfully present immigrants and others, the likelihood of chaos resulting from South Carolina enforcing its separate immigration regime is apparent.").

Regarding the balance of harms and public interest factors, the Eighth Circuit has held that they "drop from the case" altogether if a plaintiff establishes preemption and irreparable harm. *Bank One v. Guttau*, 190 F.3d 844, 847–48 (8th Cir. 1999) ("[The party challenging the state legislation] will be entitled to injunctive relief no matter what the harm to the State, and the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law."). More recently, the Eighth Circuit has held that those two factors "merge" when the party opposing the injunction is a state official acting in his or her official capacity. *See Eggers v. Evnen*, 48 F.4th 561, 564–65 (8th Cir. 2022). In an abundance of caution, the Court will not disregard the balance of harm and public interest factors altogether, but rather will follow *Eggers v. Evnen* by treating them as one-and-the-same.

The crucial question is whose interest prevails in a situation where the United States and State of Iowa are on opposite sides of the case, as both sides can credibly claim injury to the public when they are enjoined from executing their respective laws as they see fit. *See Texas*, 97 F.4th at 295–96 (recognizing that both the United States and Texas face potential irreparable harm). The Fifth Circuit held that in the areas of immigration and foreign affairs, it is the *federal* interest that prevails, as "state and local interests are subservient to those of the nation at large." *Id.* at 296 (citing *Hines v. Davidowitz*, 312 U.S. 52, 63–64 (1941)). The Fourth and Eleventh Circuits agree. *See Alabama*, 691 F.3d at 1301 ("[W]e discern no harm from the state's nonenforcement of invalid legislation."); *South Carolina*, 720 F.3d at 533 (affirming entry of preliminary injunction). This Court finds these cases persuasive and therefore concludes that the "merged" balance of harm and

public interest factors weigh in favor of injunctive relief when, as here, the state law is likely preempted by federal law. *See also Guttau*, 190 F.3d at 847–48.

 This conclusion does not change even if, as Defendants argue, Senate File 2340 should be interpreted the same way as federal law. In that scenario, Iowa is not trying to enforce any unique interest, but rather is trying to help (or, one might say, to *compel*) the United States to carry out federal immigration laws. The federal interest remains just as paramount in this circumstance as it would be if the federal and state laws diverged. *See Arizona*, 567 U.S. at 401 ("Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards.").

 In sum, the *Dataphase* factors weigh in favor of injunctive relief for both the United States and Iowa MMJ Plaintiffs as to the provisions of Senate File 2340 making illegal reentry a state law crime, requiring state court judges to enter orders requiring noncitizens to leave, and forbidding the abatement of state criminal prosecutions even when defendants have initiated or intend to initiate federal proceedings to establish lawful status. Because Defendants admit these provisions cannot be severed from the remaining aspects of Senate File 2340 (*see* United States Docket ECF 28, p. 51), the Court concludes that the *Dataphase* factors weigh in favor of preliminary injunctive relief as to Senate File 2340 as a whole.

## VI. CONCLUSION.

 The United States and Iowa MMJ Plaintiffs have established a likelihood of success on the merits of their position that federal immigration law preempts Senate File 2340 under both conflict and field preemption. For this reason, and because the remaining preliminary injunction factors also weigh in favor of injunctive relief, the Court GRANTS the motions for preliminary injunction filed by the United States and Iowa MMJ Plaintiffs in their respective cases. Defendants are hereby ENJOINED from enforcing Senate File 2340 pending further proceedings.

 **IT IS SO ORDERED.**

Dated: June 17, 2024

                         
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE

Add. 50

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 22nd day of July, 2024, this addendum was electronically filed with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

/s/ *Patrick Valencia*
Deputy Solicitor General