## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STATE OF IOWA; KIMBERLY REYNOLDS, in her official capacity as Governor of Iowa; BRENNA BIRD, in her official capacity as Attorney General of Iowa; IOWA DEPARTMENT OF PUBLIC SAFETY; and STEPHAN KENNETH BAYENS, in his official capacity as Commissioner of Iowa Department of Public Safety,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Southern District of Iowa

———————————

## BRIEF FOR THE UNITED STATES

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

DANIEL TENNY
LEIF OVERVOLD
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7226*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-4631*

## SUMMARY OF THE CASE AND
## STATEMENT REGARDING ORAL ARGUMENT

This case concerns Iowa's Senate File 2340 (SF 2340), which would impose state criminal penalties on noncitizens who enter or are found in Iowa if they have previously been excluded or removed from the United States and would require Iowa courts to order those noncitizens to return to foreign countries without those countries' consent and without observing the requirements of federal law governing removal. The district court correctly recognized that federal law preempts SF 2340 and entered a preliminary injunction against its enforcement.

The Court has set this case for argument in the September 2024 session of court in St. Louis. Iowa has requested 15 minutes per side for oral argument, and the United States has no objection to that time allocation.

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE AND STATEMENT REGARDING ORAL
ARGUMENT ...................................................................................................i

TABLE OF AUTHORITIES ...........................................................................iv

INTRODUCTION ............................................................................................1

STATEMENT OF JURISDICTION ...............................................................2

STATEMENT OF THE ISSUE ......................................................................2

STATEMENT OF THE CASE ........................................................................3

    A.    Statutory Background...........................................................................3

    B.    Factual Background ..............................................................................6

    C.    Prior Proceedings ................................................................................7

SUMMARY OF ARGUMENT ...................................................................... 10

ARGUMENT ................................................................................................. 12

STANDARD OF REVIEW ............................................................................ 12

I.    THE UNITED STATES IS LIKELY TO SUCCEED ON THE MERITS............................ 13

    A.    Iowa's effort to regulate the entry and removal of noncitizens is
        barred by field preemption. ...........................................................13

    B.    SF 2340 impermissibly conflicts with federal law.....................19

    C.    Iowa's defenses are meritless. .......................................................24

        1.    Iowa's efforts to rewrite its law only underscore the
            statute's incompatibility with the federal scheme...........................24

        2.    The United States may sue in equity to enjoin federally
            preempted state laws........................................................................28

Appellate Case: 24-2265    Page: 3    Date Filed: 08/20/2024 Entry ID: 5426118

3. The United States may challenge Section 4. ....................................33

II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CONCLUDING THAT THE BALANCE OF HARMS AND THE PUBLIC INTEREST WARRANT A PRELIMINARY INJUNCTION ........................................................................... 34

CONCLUSION ............................................................................................. 37

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

Appellate Case: 24-2265    Page: 4    Date Filed: 08/20/2024 Entry ID: 5426118

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*American Sch. of Magnetic Healing v. McAnnulty,*
    187 U.S. 94 (1902) ...................................................................................28

*Arizona v. United States,*
    567 U.S. 387 (2012) ............................................................................*passim*

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) ...........................................................................28, 30

*Attorney-General v. Corporation of Poole,*
    (1838) 41 Eng. Rep. 7 (High. Ct. Ch.), *aff'd sub nom. Parr v. Attorney-General,*
    (1842) 8 Eng. Rep. 159 (H.L.) ..........................................................29

*Biden v. Texas,*
    597 U.S. 785 (2022) ...........................................................................22

*Buckman Co. v. Plaintiffs' Legal Comm.,*
    531 U.S. 341 (2001) ...........................................................................18

*California v. Zook,*
    336 U.S. 725 (1949) ...........................................................................18

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
    520 U.S. 564 (1997) ...........................................................................16

*Courthouse News Serv. v. Gilmer,*
    48 F.4th 908 (8th Cir. 2022) .............................................................32

*Craig v. Simon,*
    980 F.3d 614 (8th Cir. 2020) ............................................................13

*Crosby v. National Foreign Trade Council,*
    530 U.S. 363 (2000) .......................................................................20, 35

*Debs, In re,*
    158 U.S. 564 (1895) ...........................................................................31

iv

*DeCanas v. Bica,*
    424 U.S. 351 (1976) ................................................................. 3, 16

*Fox v. Ohio,*
    46 U.S. (5 How.) 410 (1847) ..............................................18

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010) ...........................................................28-29

*Gilbert v. Minnesota,*
    254 U.S. 325 (1920) ...............................................................18

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999) ...............................................................28

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ...........................................................14, 22

*Hughes v. Trustees of Morden Coll.,*
    (1748) 27 Eng. Rep. 973 (High Ct. Ch.)..............................29

*Johnson v. Griffin,*
    69 F.4th 506 (8th Cir. 2023)..................................................32

*Kansas v. Garcia,*
    589 U.S. 191 (2020) ...............................................................23

*Keller v. City of Fremont,*
    719 F.3d 931 (8th Cir. 2013)...........................................27, 28

*Loney, In re,*
    134 U.S. 372 (1890) ...............................................................18

*Middlesex Cty. Sewerage Auth. v. National Sea Clammers Ass'n,*
    453 U.S. 1 (1981) ...................................................................30

*New Orleans Pub. Serv., Inc. v. Council of New Orleans,*
    491 U.S. 350 (1989) ...............................................................34

*Osborn v. Bank of the U.S.,*
    22 U.S. (9 Wheat.) 738 (1824)..............................................32

Appellate Case: 24-2265    Page: 6    Date Filed: 08/20/2024 Entry ID: 5426118

*Patel v. Garland,*
   596 U.S. 328 (2022) ..................................................................14

*Sanitary Dist. of Chi. v. United States,*
   266 U.S. 405 (1925) ..................................................................32

*Terrett v. Taylor,*
   13 U.S. (9 Cranch) 43 (1815) ...................................................29

*Truax v. Raich,*
   239 U.S. 33 (1915) .............................................................14, 29

*United States v. American Bell Tel. Co.,*
   128 U.S. 315 (1888) ..................................................................30

*United States v. Davis,*
   260 F.3d 965 (8th Cir. 2001) ...............................................16, 23

*United States v. Oklahoma,*
   No. CIV-24-511-J, 2024 WL 3449197 (W.D. Okla. June 28, 2024), *appeal pending,*
   No. 21-6144 (10th Cir. filed July 17, 2024 .....................................16

*United States v. San Jacinto Tin Co.,*
   125 U.S. 273 (1888) ..................................................................30

*United States v. South Carolina,*
   720 F.3d 518 (4th Cir. 2013) .......................................................15

*United States v. Texas,*
   143 U.S. 621 (1892) ..................................................................30

*United States v. Texas,*
   599 U.S. 670 (2023) ..................................................................20

*United States v. Texas,*
   97 F.4th 268 (5th Cir. 2024) .................................1, 2, 15-16, 20, 21, 22

*United States v. Texas,*
   No. 1:23-cv-1537, 2024 WL 861526 n.14 (W.D. Tex. Feb. 29, 2024) ...............19

vi

*Virginia Office for Prot. & Advocacy v. Stewart,*
  563 U.S. 247 (2011) ...........................................................................32

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ...............................................................................13

*Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc.,*
  475 U.S. 282 (1986) ...........................................................................18

*Wyandotte Transp. Co. v. United States,*
  389 U.S. 191 (1967) ...........................................................................31

*Young, Ex Parte,*
  209 U.S. 123 (1908) ...........................................................................32

## U.S. Constitution:

Art. VI, cl. 2 ........................................................................................2

## Statutes:

Pub. L. No. 105-277, div. G, § 2242 (1998) ..........................................4

6 U.S.C. § 202 ........................................................................................3

6 U.S.C. § 251 ........................................................................................5

6 U.S.C. § 557 ........................................................................................5

8 U.S.C. § 1101(a)(15)(T)(i)(III)(aa) .............................................. 3, 17

8 U.S.C. § 1101(a)(15)(U)(iii) ..............................................................17

8 U.S.C. § 1103(a)(1) ..............................................................................3

8 U.S.C. § 1103(g) ..................................................................................3

8 U.S.C. § 1158(a) ................................................................................19

vii

8 U.S.C. § 1158(a)-(b) ...........................................................................4

8 U.S.C. § 1158(a)(2)(A) ......................................................................4

8 U.S.C. §§ 1181-1182 ..........................................................................3

8 U.S.C. §§ 1181-1188 ........................................................................15

8 U.S.C. § 1182 ...................................................................................15

8 U.S.C. § 1182(a) ................................................................................4

8 U.S.C. § 1188 .....................................................................................3

8 U.S.C. §§ 1201-1204 ........................................................................15

8 U.S.C. §§ 1223-1225 ..........................................................................3

8 U.S.C. § 1225 ...............................................................................4, 15

8 U.S.C. §§ 1225-1229a .......................................................................15

8 U.S.C. § 1227(a) ................................................................................4

8 U.S.C. § 1229 .....................................................................................4

8 U.S.C. § 1229a ...................................................................................4

8 U.S.C. § 1229a(a)(3) ....................................................................4, 15

8 U.S.C. § 1231 ...............................................................................

8 U.S.C. § 1231(b) .........................................................................4, 20

8 U.S.C. § 1231(b)(1)-(2) .....................................................................4

8 U.S.C. § 1231(b)(1)(B) ......................................................................4

8 U.S.C. § 1231(b)(2) ..........................................................................22

8 U.S.C. § 1231(b)(2)(B) ......................................................................4

viii

8 U.S.C. § 1231(b)(3) ......................................................................... 4, 19

8 U.S.C. § 1231 note ...................................................................... 4, 21, 35

8 U.S.C. § 1252c ...................................................................................... 5

8 U.S.C. § 1252c(a) ................................................................................. 5

8 U.S.C. § 1304(e) ................................................................................. 24

8 U.S.C. § 1306(a) ................................................................................. 24

8 U.S.C. § 1324(c) .................................................................................. 5

8 U.S.C. §§ 1325-1326 ............................................................................ 3

8 U.S.C. § 1325(a)-(b) ........................................................................... 15

8 U.S.C. § 1326 ............................................................... 2, 15, 21, 25

8 U.S.C. § 1326(a) .................................................................................. 6

8 U.S.C. § 1326(a)(2) ............................................................................. 25

8 U.S.C. § 1326(b) ................................................................................. 27

8 U.S.C. § 1357(g) ........................................................ 5, 17, 21

8 U.S.C. § 1357(g)(1)-(9) ....................................................................... 5

8 U.S.C. § 1357(g)(3) ............................................................................. 5

8 U.S.C. § 1357(g)(10) ........................................................................... 6

18 U.S.C. § 758 .................................................................................... 17

22 U.S.C. § 7105(b)(1)(E)(iv) ............................................................... 17

28 U.S.C. § 1292(a)(1) ............................................................................ 2

ix

28 U.S.C. § 1331 ................................................................................. 2, 28

28 U.S.C. § 1345 ......................................................................................2

28 U.S.C. § 1651 ....................................................................................28

Iowa Code § 718C.2 ............................................................................ 2, 6

Iowa Code § 718C.3 ................................................................................2

Iowa Code § 718C.4 ............................................................................ 2, 6

Iowa Code § 718C.4(1)-(3) .....................................................................7

Iowa Code § 718C.4(4) ...................................................................... 7, 26

Iowa Code § 718C.5 ........................................................................2, 7, 26

Iowa Code § 718C.6 ..........................................................................7, 26

## Regulations:

8 C.F.R. §§ 208.16(c)-208.18 ................................................................4

8 C.F.R. § 241.15 ....................................................................................4

8 C.F.R. § 1208.16(c) ...........................................................................20

8 C.F.R. §§ 1208.16(c)-1208.18 ...............................................4, 21, 35

## Rules:

Fed. R. App. P. 4(a)(1)(B) ......................................................................2

## Other Authorities:

Samuel L. Bray & Paul B. Miller, *Getting into Equity*,
   97 Notre Dame L. Rev. 1763 (2022) ...............................................28

Dep't of Homeland Sec., *Fact Sheet: President Biden's Presidential Proclamation and Joint DHS-DOJ Interim Final Rule Cut Encounters at Southwest Border by 55 Percent* (July 24, 2024), https://perma.cc/YA3H-CVQ9 .........................................................................19

Henry E. Smith, *Equity as Meta-Law*, 130 Yale L.J. 1050 (2021) .....................................30

Appellate Case: 24-2265     Page: 12     Date Filed: 08/20/2024 Entry ID: 5426118

# INTRODUCTION

In *Arizona v. United States*, the Supreme Court held that an Arizona law purporting to mirror federal criminal provisions regarding registration of noncitizens was preempted. 567 U.S. 387 (2012). Iowa's Senate File 2340 (SF 2340) undermines federal immigration law even more profoundly because it interferes with the federal government's exclusive control over the core subjects of entry and removal of noncitizens and directly conflicts with federal law. A recent ruling from the Fifth Circuit addressing a nearly identical Texas law confirms that SF 2340 is preempted. *See United States v. Texas*, 97 F.4th 268 (5th Cir. 2024) (denying stay pending appeal). Iowa's heavy reliance on the *Arizona* dissent merely underscores the inconsistency of its enactment with controlling precedent.

Allowing SF 2340 to go into effect would upset the status quo between the United States and the States in the context of immigration that has existed for almost 150 years, and would cause the United States to suffer immediate and irreparable harm. It would interfere with the federal government's ability to conduct foreign relations at a time when the United States is seeking diplomatic solutions to ameliorate irregular migration at the southern border. It would interfere with the United States' treaty obligations, federal law-enforcement efforts, and the orderly processing of noncitizens entering the United States. Because Iowa cannot show comparable harm, the district court correctly entered a preliminary injunction.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1345 over the United States' constitutional challenge. App. Vol. II 249; R. Doc. 1, at 1. The district court issued an order preliminarily enjoining SF 2340 on June 17, 2024, App. Vol. II 467; R. Doc. 29, at 25, and defendants-appellants timely appealed from that order on June 19, 2024, R. Doc. 31, at 1; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit).

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court acted within its discretion in preliminarily enjoining an Iowa law that would impose state criminal penalties on noncitizens who enter or are found in Iowa if they have previously been excluded or removed from the United States and would require Iowa courts to order the return of those noncitizens to foreign countries without those countries' consent and without observing the requirements of federal law governing removal.

The most apposite authorities are:

- *Arizona v. United States*, 567 U.S. 387 (2012); and,

- *United States v. Texas*, 97 F.4th 268 (5th Cir. 2024).

The most apposite constitutional and statutory provisions are:

- U.S. Const. art. VI, cl. 2;

- 8 U.S.C. § 1326; and,

- Iowa Code §§ 718C.2, 718C.3, 718C.4, 718C.5.

2

## STATEMENT OF THE CASE

### A.     Statutory Background

"The federal power to determine immigration policy is well settled." *Arizona v. United States*, 567 U.S. 387, 395 (2012); *see also, e.g.*, *DeCanas v. Bica*, 424 U.S. 351, 354 (1976) (recognizing that the "[p]ower to regulate immigration is unquestionably exclusively a federal power").  Pursuant to this "broad, undoubted power over the subject of immigration and the status of [noncitizens]," *Arizona*, 567 U.S. at 394, Congress has enacted the Immigration and Nationality Act (INA) as "the comprehensive federal statutory scheme for [the] regulation of immigration," *DeCanas*, 424 U.S. at 353, to be administered and enforced by the Secretary of Homeland Security and the Attorney General, 6 U.S.C. § 202; 8 U.S.C. § 1103(a)(1), (g).

This comprehensive framework sets forth detailed rules governing the entry and removal of noncitizens.  It identifies who may or may not be admitted, *see, e.g.*, 8 U.S.C. §§ 1181-1182, 1188, indicates how noncitizens may enter the country lawfully, *see, e.g.*, *id.* §§ 1223-1225, and imposes criminal and civil penalties on those who unlawfully enter, *see id.* §§ 1325-1326.

Federal law also comprehensively regulates the removal of noncitizens. Congress provided for removal proceedings to be conducted before an immigration judge, with the right to appeal to an Article III court.  With specified exceptions for other federally initiated procedures, these proceedings are the "sole and exclusive

3

procedure for determining whether [a noncitizen] may be . . . removed from the United States." 8 U.S.C. § 1229a(a)(3). Federal law also establishes, among other things, the grounds on which a noncitizen may be ordered removed, *see, e.g., id.* §§ 1182(a), 1227(a), the requirements for commencing and administering proceedings, and the procedural protections afforded to noncitizens, *see, e.g., id.* §§ 1225, 1229, 1229a. And it establishes the grounds on which a noncitizen may apply for relief or protection from removal, including asylum, withholding of removal, and protections under regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention Against Torture). *See, e.g., id.* §§ 1158(a)-(b), 1231(b)(3), 1231 note (Pub. L. No. 105-277, div. G, § 2242 (1998)); 8 C.F.R. §§ 208.16(c)-208.18, 1208.16(c)-1208.18.

Federal law also establishes the process for selecting and coordinating with the country to which a noncitizen may be removed. *See* 8 U.S.C. § 1231(b); 8 C.F.R. § 241.15; *see also* 8 U.S.C. § 1158(a)(2)(A). Federal law establishes an ordering of countries to which a noncitizen may be removed, 8 U.S.C. § 1231(b)(1)-(2), and imposes particular limits on removing noncitizens to a contiguous country of which they are not a "native, citizen, subject, or national," or prior resident, *id.* § 1231(b)(2)(B); *see also id.* § 1231(b)(1)(B).

Federal law also addresses how state and local officers may assist or cooperate with federal officials in their enforcement of federal immigration law. The INA

4

expressly authorizes state and local law-enforcement officers to make arrests for violations of a narrow subset of the INA's prohibitions, concerning smuggling, transporting, or harboring noncitizens. *See* 8 U.S.C. § 1324(c). And where state and local officers have received prior confirmation from federal immigration officials regarding a noncitizen's immigration status, they may also (if authorized by state law) arrest and detain a noncitizen who is illegally present in the United States if the noncitizen was previously convicted of a felony in the United States and then was removed from or left the United States. *Id.* § 1252c. That detention, however, may extend no longer than necessary for federal officers to take the noncitizen into custody for purposes of removal proceedings. *Id.* § 1252c(a).

Congress has also authorized the Department of Homeland Security (DHS) to enter into written cooperative agreements with States and localities. 8 U.S.C. § 1357(g). Under those agreements, appropriately trained and qualified state and local officers may perform specified functions of a federal immigration officer relating to the investigation, apprehension, or detention of noncitizens, *id.* § 1357(g)(1)-(9), "subject to the direction and supervision of the [Secretary]," *id.* § 1357(g)(3).[1] Even absent such an agreement, the INA provides that state and local officers may "communicate with the [Secretary] regarding the immigration status of any individual" or "otherwise . . . cooperate with the [Secretary] in the identification, apprehension,

---

[1] Section 1357 refers to the Attorney General, but those functions have been transferred to the Secretary. *See* 6 U.S.C. §§ 251, 557.

Appellate Case: 24-2265   Page: 17   Date Filed: 08/20/2024 Entry ID: 5426118

detention, or removal of [noncitizens] not lawfully present in the United States." *Id.* § 1357(g)(10).

### B. Factual Background

In the face of this comprehensive scheme, Iowa enacted SF 2340, which was scheduled to take effect on July 1, 2024. The law would impose state criminal penalties on noncitizens who enter or are found in Iowa if they have previously been excluded or removed from the United States, and would require Iowa courts to order the removal of those noncitizens to foreign countries without those countries' consent and without observing the requirements of federal law governing removal.

As relevant here, the Iowa law has two principal provisions, each of which is materially identical to analogous provisions of Texas's now-enjoined law. *See* App. Vol. II 461; R. Doc. 29, at 19 (noting similarities). First, SF 2340 creates a state crime resembling 8 U.S.C. § 1326(a), the federal unlawful-reentry provision, by barring noncitizens from "enter[ing], attempt[ing] to enter," or being found in Iowa after the person "has been denied admission to or has been excluded, deported, or removed from the United States" or "has departed from the United States while an order of exclusion, deportation, or removal is outstanding." SF 2340, § 2 (codified at Iowa Code § 718C.2). The law provides no affirmative defenses or exceptions to this new state crime.

Second, SF 2340 allows state judges to order the removal of noncitizens from this country. SF 2340, § 4 (codified at Iowa Code § 718C.4). In particular,

6

noncitizens charged but not yet convicted under SF 2340 may be "discharge[d]" and "require[d] . . . to return to the foreign nation from which [they] entered or attempted to enter," if, among other things, "[t]he person agrees to the order." *Id.* § 4(1)-(3) (codified at Iowa Code § 718C.4(1)-(3)).  Upon conviction under SF 2340, a state judge "shall enter" an order "requiring the person to return to the foreign nation from which the person entered or attempted to enter" after completion of the sentence imposed by the judgment. *Id.* § 4(4) (codified at Iowa Code § 718C.4(4)).  Failure to comply with a state removal order is a class C felony. *Id.* § 5 (codified at Iowa Code § 718C.5).

For both offenses created by SF 2340, "[a] court may not abate the prosecution of [the relevant] offense . . . on the basis that a federal determination regarding the immigration status of the person [being prosecuted] is pending or will be initiated." SF 2340, § 6 (codified at Iowa Code § 718C.6).

## C.    Prior Proceedings

In separate lawsuits, the United States and a set of nonfederal plaintiffs brought suit challenging SF 2340.  App. Vol. II 248-66; R. Doc. 1, at 1-19; *see* Complaint for Declaratory and Injunctive Relief, *Iowa Migrant Movement for Justice v. Bird*, No. 4:24-cv-161, 2024 WL 2093915 (S.D. Iowa May 9, 2024).  The United States sought a preliminary injunction.  App. Vol. II 269-70; R. Doc. 7, at 1-2.

The district court granted the motion and preliminarily enjoined enforcement of SF 2340.  App. Vol. II 467; R. Doc. 29, at 25.

7

The district court concluded that the United States is likely to prevail on the merits because federal law preempts SF 2340.  The district court held that *Arizona* "compel[s] th[e] conclusion" that SF 2340 is field preempted, as "Congress 'left no room' for state regulation because such regulation would 'frustrate federal policies' and interfere with the comprehensive scheme established under federal law."  App. Vol. II 462-63; R. Doc. 29, at 20-21 (quoting *Arizona*, 567 U.S. at 399, 402).  The district court also held that principles of conflict preemption prevent Iowa from enforcing SF 2340 because the State's enactment conflicts with federal law in several ways:  by subjecting even certain noncitizens with lawful status under federal law to criminal penalties, by preventing state judges from abating prosecutions while a defendant "seeks relief under federal law," and by directing the issuance of orders requiring noncitizens to leave the United States outside of the "intricate and specialized system" for removal that Congress has established.  App. Vol. II 463-64; R. Doc. 29, at 21-22.  The district court also rejected Iowa's arguments that the United States lacks a cause of action, App. Vol. II 460-61; R. Doc. 29, at 18-19, and that the United States lacks standing to challenge the provision of SF 2340 governing removal orders, App. Vol. II 452-53; R. Doc. 29, at 10-11.

The district court also held that the remaining preliminary injunction factors favor the United States.  The district court recognized that the United States would suffer "significant harm when a state tries to enforce its own immigration laws that are likely preempted by federal law."  App. Vol. II 465; R. Doc. 29, at 23.  Specifically,

8

the district court held that the United States could be harmed by "state court prosecutions for illegal reentry moving forward even when defendants are in the process of applying for legal status under federal law"; "untrained state court judges entering orders requiring noncitizens to leave the United States following an adjudicatory process with fewer safeguards and far less sophistication than the federal system"; "state court judges requiring noncitizens to return to countries where they might not be accepted or might face persecution or torture, in violation of federal laws and treaties"; "noncitizens being delivered to a port of entry with no clear mechanism for what happens next"; and "corresponding impacts on international relations and foreign affairs." App. Vol. II 465-66; R. Doc. 29, at 23-24. "Collectively, these harms are significant enough to make the threat of irreparable harm factor weigh in favor of injunctive relief . . . ." App. Vol. II 466; R. Doc. 29, at 24. Turning to balance the equities, the district court held that "in the areas of immigration and foreign affairs, it is the *federal* interest that prevails." App. Vol. II 466-67; R. Doc. 29, at 24-25.

Accordingly, the district court preliminarily enjoined defendants from enforcing SF 2340 in its entirety. App. Vol. II 467; R. Doc. 29, at 25 (noting Iowa's concession that the invalid portions of the law are not severable). The court did not reach the United States' separate argument that the state enactment was inconsistent with the Foreign Commerce Clause.

Iowa timely appealed. R. Doc. 31, at 1.

9

## SUMMARY OF ARGUMENT

**I.** The United States is likely to succeed on the merits of its claim. SF 2340 is preempted by federal law, and Iowa's defenses are meritless.

**A.** As the Supreme Court has long recognized, Congress has wholly occupied the field of regulating the entry and removal of noncitizens. Congress's comprehensive and highly reticulated scheme leaves no room for state regulation—even if the State attempts to complement federal law. The federal government must exercise exclusive prosecutorial discretion in this field to preserve a single national immigration policy. SF 2340 impermissibly intrudes into an exclusively federal field and is thus preempted.

**B.** SF 2340 also conflicts with federal law in multiple respects. In addition to interfering with the federal government's ability to carry out foreign affairs, the law would fundamentally disrupt the federal immigration regime by allowing a single State to make unilateral determinations regarding unlawful entry and removal, far in excess of the carefully limited circumstances in which Congress has authorized state officials to perform or assist in the functions of federal immigration officers. SF 2340's specifics only confirm its incompatibility with the federal scheme. They include that SF 2340 bypasses the federal framework for removal of noncitizens, declines to replicate an exemption included in the federal prohibition on reentry, and requires state judges to order noncitizens removed to the country from which they entered the

Appellate Case: 24-2265    Page: 22    Date Filed: 08/20/2024 Entry ID: 5426118

United States, without that country's consent and in disregard of the congressionally mandated process for selecting the country of removal.

**C.** Iowa's defenses to the United States' claims are meritless.

**1.** Iowa largely elides the relevant issues by focusing on various respects in which it believes the district court misconstrued its statute. But even if Iowa's implausible characterizations of its enactment are accepted, at its core the state statute still purports to create a parallel scheme of immigration enforcement. Iowa's efforts to rewrite its statute are relevant only insofar as they reflect Iowa's discomfort with defending its enactment as written.

**2.** Iowa cannot square its argument that the United States lacks a right of action with the long tradition of equitable suits for prohibitory injunctions to prevent governmental officials from directly injuring a plaintiff in violation of the Constitution, including the materially identical suit in *Arizona*. That equitable right of action exists unless Congress has displaced it, and Iowa makes no argument that Congress has precluded the United States from suing in equity to vindicate its sovereign interests.

**3.** Iowa cannot evade judicial review of the statute's provision contemplating orders of removal on the ground that state judges, and not state prosecutors, apply that provision. State prosecutors participate in criminal enforcement, and in any event, the State cannot continue to operate an unconstitutional removal scheme by

11

carving off the remedial provision from the prosecutorial action that commences the proceeding.

**II.** The balance of equities and the public interest support the preliminary injunction, and Iowa's contrary argument largely rehashes its mistaken argument on the merits. The United States inherently suffers harm when a State enforces a preempted law. Beyond that inherent harm, enforcement of SF 2340 would interfere with the federal government's efforts to find diplomatic solutions to irregular migration across the southern border, as evidenced by Mexico's objections to the State's enactment. Enforcement would risk retaliation against U.S. nationals abroad, likely cause the United States to violate its treaty obligations, and hamper the federal government's efforts to process noncitizens who have unlawfully entered the United States. Iowa has offered no evidence whatsoever to support its speculative claims of countervailing harm. And because SF 2340 will interfere with federal immigration enforcement and with the federal government's relationship with Mexico, vacating the district court's injunction could worsen irregular migration, rather than improving it. The district court did not abuse its discretion in entering the preliminary injunction.

## ARGUMENT

### STANDARD OF REVIEW

To obtain a preliminary injunction, the plaintiff must show that it is likely to succeed on the merits, that it would suffer irreparable harm absent a preliminary injunction, and that the balance of the equities and the public interest favor an

Appellate Case: 24-2265     Page: 24     Date Filed: 08/20/2024 Entry ID: 5426118

injunction.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In this Circuit, likelihood of success on the merits is the most important factor.  *Craig v. Simon*, 980 F.3d 614, 617 (8th Cir. 2020) (per curiam).  This Court "review[s] the district court's factual findings for clear error, its legal conclusions *de novo*, and the ultimate decision to grant the injunction for abuse of discretion."  *Id.*

## I.  THE UNITED STATES IS LIKELY TO SUCCEED ON THE MERITS

As relevant here, state law is preempted either when Congress occupies a field leaving no room for state regulation or when state law conflicts with federal law, expressly or implicitly.  *See Arizona v. United States*, 567 U.S. 387, 399 (2012).  Both field and conflict preemption preclude Iowa from enforcing SF 2340.  Iowa cannot avoid these conclusions by attempting to rewrite its law; even accepting Iowa's atextual interpretation of SF 2340, federal law wholly preempts it.  Nor can Iowa prevail by asserting that the United States lacks standing to challenge portions of its enactment or that the United States cannot sue to enjoin a preempted law.

### A.  Iowa's effort to regulate the entry and removal of noncitizens is barred by field preemption.

**1.**  "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  *Arizona*, 567 U.S. at 399.  "The intent to displace state law altogether can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant

13

that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (cleaned up).

Applying these principles in *Arizona*, the Supreme Court held that federal law preempted a state criminal statute relating to noncitizen registration. 567 U.S. at 403. SF 2340 undermines federal immigration law even more directly by intruding into the field of admitting and removing noncitizens and enforcing the related sanctions that the INA prescribes, functions that lie at the core of the federal government's sovereign prerogatives to regulate immigration.

The *Arizona* decision followed from basic principles regarding the division of authority between the federal government and the States. "The authority to control immigration—to admit or exclude [noncitizens]—is vested solely in the Federal government." *Truax v. Raich*, 239 U.S. 33, 42 (1915); *see also Arizona*, 567 U.S. at 409-10. The regulation of noncitizens "is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the [S]tate also acts on the same subject," state law must yield to federal. *Hines v. Davidowitz*, 312 U.S. 52, 66 (1941). "[I]nternational controversies of the gravest moment, sometimes even leading to war, may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government." *Id.* at 64.

Here, Congress has created a comprehensive and highly reticulated scheme governing the admission and removal of noncitizens. *See Patel v. Garland*, 596 U.S. 328, 331 (2022). Congress decided which noncitizens may be admitted to the United

14

States and how to admit them. 8 U.S.C. §§ 1181-1188, 1201-1204, 1225. Congress decided which noncitizens may be removed from the United States and how to remove them. *Id.* §§ 1182, 1225-1229a; *see id.* § 1229a(a)(3) (providing that, except as otherwise specified in the INA, federal removal proceedings are "the sole and exclusive procedure" for determining whether to admit or remove a noncitizen). And Congress decided when a noncitizen's entry into the United States is—and is not—a crime. *Id.* §§ 1325(a)-(b), 1326.

That "framework of regulation [is] so pervasive that Congress left no room for the States to supplement it," such that "even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 399, 401 (cleaned up). Otherwise, "the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402. The district court thus properly held that SF 2340 "creates an untenable dichotomy between federal and state law in an area where the Supreme Court has recognized that the United States must speak with a single, harmonious voice." App. Vol. II 464; R. Doc. 29, at 22. This holding echoed multiple courts of appeals that have applied similar reasoning to state analogs to other aspects of the federal immigration scheme, *e.g.*, *United States v. South Carolina*, 720 F.3d 518, 530-31 (4th Cir. 2013), as well as a decision of the Fifth Circuit concluding that a materially identical Texas law was likely preempted, *United States v. Texas*, 97 F.4th 268, 291 (5th Cir.

15

Appellate Case: 24-2265     Page: 27     Date Filed: 08/20/2024 Entry ID: 5426118

2024) (denying stay); *see also United States v. Oklahoma*, No. CIV-24-511-J, 2024 WL 3449197, at *6-12 (W.D. Okla. June 28, 2024) (concluding a similar Oklahoma law is likely preempted), *appeal pending*, No. 21-6144 (10th Cir. filed July 17, 2024).

**2.** Iowa's efforts to defend SF 2340 merely underscore its incompatibility with controlling precedent. Iowa opens its brief with a quotation from the dissenting opinion in *Arizona* and relies heavily on that dissent throughout its argument. *See* Br. 4, 51, 54, 65 (citing *Arizona*, 567 U.S. at 417-18, 425, 436 (Scalia, J., concurring in part and dissenting in part)). Iowa then starts its field-preemption argument by quoting a dissent that sought to cast doubt on the doctrine of field preemption. *See* Br. 50 (citing *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 616-17 (1997) (Thomas, J., dissenting)). Iowa is free to ask the Supreme Court to overturn its precedents, but this Court must follow them, and Iowa's heavy reliance on dissenting opinions provides no basis for overturning the district court's application of controlling law. *See United States v. Davis*, 260 F.3d 965, 969 (8th Cir. 2001) ("It is our role to apply Supreme Court precedent as it stands, and not as it may develop.").

Iowa also fundamentally misunderstands the district court's careful analysis when it contends that the district court "preempt[ed] the entire field of immigration." Br. 50. It is common ground that Congress has not preempted "every state enactment which in any way deals with [noncitizens]," *DeCanas v. Bica*, 424 U.S. 351, 355 (1976), and far from purporting to preempt the entire field of immigration, the district court merely held that the logic of the *Arizona* decision applied to "the context

16

of illegal reentry" just as it applied to the context of noncitizen registration, App. Vol. II 462; R. Doc. 29, at 20. That limited holding is correct: Iowa offers no support for the improbable proposition that, while Congress preempted parallel state prosecutions in the area of noncitizen registration, it intended to allow States to exercise the core federal power over immigration by directly enforcing federal prohibitions on entry and ordering the return of noncitizens from the United States, including removal to a non-consenting foreign nation. *See* App. Vol. II 464; R. Doc. 29, at 22.

The circumstances in which Congress permitted States to participate in immigration enforcement further highlight that Congress did not authorize States to unilaterally usurp the core federal prerogatives of prosecuting the unlawful entry of noncitizens and ordering their removal. States may cooperate with the federal government in the apprehension and detention of noncitizens. 8 U.S.C. § 1357(g); *see also* 18 U.S.C. § 758 (recognizing that state law-enforcement agents may be at federal immigration checkpoints). States may also enforce their own generally applicable laws when they apply to the conduct of noncitizens. *See, e.g.*, 22 U.S.C. § 7105(b)(1)(E)(iv) ("kidnapping" and "forced labor offenses"); 8 U.S.C. § 1101(a)(15)(T)(i)(III)(aa) ("acts of trafficking"); *id.* § 1101(a)(15)(U)(iii) (various state "criminal law[s]"). But that does not mean that States may enforce their own immigration schemes independent of the federal government.

In this respect, the Court in *Arizona* followed a long line of decisions barring parallel state-law enforcement in fields fully occupied by federal law. 567 U.S. at 402

17

(first cing *Wisconsin Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 288-89 (1986); then citing *California v. Zook*, 336 U.S. 725, 730-31 (1949); then citing *In re Loney*, 134 U.S. 372, 375-76 (1890); and then citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48 (2001)). For instance, the Court held in *Loney* that States have no power to punish perjury before a federal tribunal. The state prosecution was impermissible not because federal and state perjury laws were substantively different, but because a federal witness's breach of his duty of truthfulness does not impair "any authority derived from the State." *Loney*, 134 U.S. at 374. And *Loney* distinguished that circumstance from cases where the Court had recognized that "the same act" may validly constitute "a violation of the laws of the State, as well as of the laws of the United States." *Id.* at 375. In those cases, unlike in *Loney*, the state statutes addressed questions of legitimate local concern distinct from the federal offense. *Id.* (citing *Fox v. Ohio*, 46 U.S. (5 How.) 410 (1847)); *see also Gilbert v. Minnesota*, 254 U.S. 325 (1920).

The same principles apply here. Whether or not a noncitizen violated federal law by unlawfully entering the United States, Iowa may prosecute a noncitizen who commits violent crimes, possesses illegal drugs, or otherwise violates the State's generally applicable criminal laws that do not turn on noncitizens' immigration status. By contrast, ensuring compliance with federal entry and reentry provisions does not lie within any traditional police power of the State but is instead a field of national

18

concern—implicating national sovereignty, national security, and foreign affairs—occupied by Congress. Even parallel state regulation, therefore, is preempted.

Finally, Iowa's argument (at 58-59) that the United States has abandoned the field is both incorrect and irrelevant. The federal government has "removed 472,000 individuals between May through December of 2023—more than any single year since 2015." *United States v. Texas*, No. 1:23-cv-1537, 2024 WL 861526, at *14 n.14 (W.D. Tex. Feb. 29, 2024); *see also* Dep't of Homeland Sec., *Fact Sheet: President Biden's Presidential Proclamation and Joint DHS-DOJ Interim Final Rule Cut Encounters at Southwest Border by 55 Percent* (July 24, 2024), https://perma.cc/YA3H-CVQ9 ("DHS removed or returned over 740,000 individuals in the 12 months after the end of the Title 42 public health Order, more than any year since 2010"). Moreover, the relevant question is whether Congress has regulated a field, not the degree to which Congress has appropriated enforcement resources or the Executive Branch has exercised its enforcement discretion.

## B. SF 2340 impermissibly conflicts with federal law.

**1.** SF 2340 also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (citation omitted). Determinations related to the entry and removal of citizens of foreign nations must be based on the implementation of the complex immigration regime, which includes provisions regarding asylum, *see* 8 U.S.C. § 1158(a), withholding of removal, *id.* § 1231(b)(3), protection under regulations implementing U.S. obligations

19

under Article 3 of the Convention Against Torture, *e.g.*, 8 C.F.R. § 1208.16(c), and the proper country of removal, 8 U.S.C. § 1231(b). *See Texas*, 97 F.4th at 289-91 (outlining considerations under federal law). They must also take account of the federal government's foreign-relations interests. *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 679 (2023) (recognizing that "the Executive's enforcement [of immigration law] implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives'" (citation omitted)).

As in *Arizona*, "[p]ermitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted." 567 U.S. at 402. Enforcement of federal immigration law, which necessarily imposes consequences for foreign nationals based on acts committed in violation of federal law, involves a sensitive balancing of federal interests. *See id.* at 395. In this circumstance, "[t]he fact of a common end hardly neutralizes conflicting means." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 379 (2000). To the contrary, allowing a single State to imprison foreign nationals for unlawfully entering the United States or order them removed to a non-consenting foreign country, without regard to the interests of the Nation as a whole, would fundamentally undermine that congressional scheme and "compromise the very capacity" of the federal government "to speak for the Nation with one voice in dealing with other governments." *Id.* at 381; *see also Texas*, 97 F.4th at 289-91 (concluding Texas's analogous law blocked federal officials from exercising broad discretion conferred by the INA). In short, by

20

allowing Iowa to unilaterally engage in its own immigrant enforcement efforts,

SF 2340 vastly exceeds the "limited circumstances in which state officers may" assist

and cooperate with federal enforcement. *Arizona*, 567 U.S. at 408; *see* 8 U.S.C.

§ 1357(g); *see also Texas*, 97 F.4th at 292-93; *supra* pp. 4-6, 17.

SF 2340's specifics underscore its incompatibility with the federal scheme.

SF 2340 affords no protections against removal of noncitizens facing persecution or

torture, notwithstanding the prohibition under Article 3 of the Convention Against

Torture, as implemented through federal law, against refoulement—the return of a

noncitizen to a country where he more likely than not would be tortured. *E.g.*, 8

C.F.R. § 1208.16(c)-.18; *see* 8 U.S.C. § 1231 note. SF 2340 bypasses the INA's

guarantees of a noncitizen's right to federal removal or expedited removal procedures,

including review by an immigration judge. *See Texas*, 97 F.4th at 289-90 (concluding

that an analogous Texas law would interfere with the process specified by the INA for

inspecting applicants for admission and determining their admissibility). SF 2340 also

declines to replicate the exemption from the federal prohibition on reentry for

noncitizens entering with the consent of the Secretary of Homeland Security, or for

whom no such consent is required, *see* 8 U.S.C. § 1326; App. Vol. II 462; R. Doc. 29,

at 20—though, as discussed below, Iowa now seeks to override that legislative

decision and argue, just as impermissibly, that state judges will apply federal

immigration standards in determining which noncitizens come within the scope of the

state criminal law, *infra* pp. 25-26.

Iowa also has no authority to bypass the detailed federal scheme for determining to which country noncitizens will be removed. *See* 8 U.S.C. § 1231(b)(2) (generally requiring removal to a non-contiguous country designated by the noncitizen or the noncitizen's country of nationality or residence). Allowing Iowa to, for example, remove noncitizens, including non-Mexicans, to Mexico even over the objection of the Government of Mexico will cause the federal government to lose the ability to speak "with one voice" on removals. *Arizona*, 567 U.S. at 409; *see also Hines*, 312 U.S. at 63 ("The Federal Government . . . is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties."); *Texas*, 97 F.4th at 291 (concluding that an analogous Texas law would allow Texas to remove noncitizens to Mexico while providing the United States "no voice in the matter"). The objection that the Government of Mexico has already lodged to SF 2340 only underscores the damage that Iowa's intended actions could cause to the United States' relations with Mexico and other nations. *See Arizona*, 567 U.S. at 409; *see also Biden v. Texas*, 597 U.S. 785, 806 (2022) (explaining that attempting to force "non-Mexican nationals" to return to Mexico "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico").

**2.** As with field preemption, Iowa commences its argument on conflict preemption by resisting binding Supreme Court precedent. It urges, in particular, that "the obstacle preemption principles that undergird the district court's ruling are constitutionally unsound," Br. 60, citing a concurring opinion that suggested that the

22

Court should "explicitly abandon [its] 'purposes and objectives' pre-emption jurisprudence," *Kansas v. Garcia*, 589 U.S. 191, 213-15 (2020) (Thomas, J., concurring). Here too, while Iowa may argue to the Supreme Court that it should overturn its precedent in this area, that case law remains binding on this Court. *See Davis*, 260 F.3d at 969.

Iowa's suggestion that parallel state and federal enforcement schemes are permissible as a general matter has no relevance to a State's effort to regulate in an area that Congress has addressed through federal standards and definitive enforcement procedures, particularly where parallel state enforcement could compromise foreign relations. The Supreme Court did not *sub silentio* overrule *Arizona* and the cases on which *Arizona* relied in *Kansas*, 589 U.S. 191. That case involved a generally applicable law about "fraud, forgeries, and identity theft" that "appl[ied] to citizens and [noncitizens] alike." *Id.* at 198. Nothing in that case—which again involved a generally applicable law and not an immigration regulation—suggests that a State may create a parallel state immigration regime regulating the entry and removal of noncitizens.

Iowa is likewise mistaken to suggest that *Arizona*'s conflict-preemption holding was limited to state enactments that "criminalized conduct that was not a federal crime." Br. 58. Section 3 of the Arizona law, which was field preempted but also presented "specific conflicts" with the federal scheme, *Arizona*, 567 U.S. at 403, created a state crime for registration offenses that are also criminal under federal law.

23

*See* 8 U.S.C. §§ 1304(e), 1306(a).  And Section 6 of the Arizona law, which authorized warrantless arrests of certain noncitizens, did not criminalize any conduct, and it was still held to be preempted because the unilateral authority it conferred "would allow the State to achieve its own immigration policy."  *Arizona*, 567 U.S. at 408.  As the Court's analysis reflects, the fundamental problem with the preempted provisions of the Arizona law, which is shared by Iowa's law here, is that unilateral enforcement by States of alleged federal immigration offenses conflicts with the federal scheme.

### C.   Iowa's defenses are meritless.

#### 1.   Iowa's efforts to rewrite its law only underscore the statute's incompatibility with the federal scheme.

Much of Iowa's argument does not even grapple with the relevant preemption principles, instead quibbling with the district court's interpretation of the statutory text.  None of Iowa's efforts to rewrite its law alter the statute's fundamental premise: Iowa seeks to create a parallel state enforcement scheme to punish unlawful entry into the United States.  Federal law facially preempts such a scheme.  And while Iowa repeatedly asserts that SF 2340 should not have been enjoined in all its applications or that the district court failed to respect a presumption of severability under Iowa law, it tellingly identifies no circumstance in which the law, which contemplates unilateral state enforcement of federal immigration laws, could constitutionally be applied.  The Supreme Court declared state-registration provisions invalid on their face in *Arizona*,

24

and there is no basis for a different result here, regardless of how the law is interpreted.

To the extent that Iowa's effort to contort the text of SF 2340 is relevant, it highlights the incompatibility of the state enactment with the congressional design. Iowa criticizes the district court's reading of SF 2340 on the ground that "allowing Iowa to prosecute persons lawfully in the United States would regulate admission and removal standards—the sole province of the federal government." Br. 27-28. But it is hard to see how SF 2340, however interpreted, would avoid regulating admission and removal standards, given that it contemplates criminal enforcement of unlawful entry and orders to return to a foreign country. That is a feature, not just of the law as applied to certain categories of individuals, but of the statute as a whole because it operates separately from the exclusive federal scheme.

Iowa insists that its enactment implicitly incorporates exceptions to the federal unlawful-reentry prohibition that are expressly set out in 8 U.S.C. § 1326, the federal provision that SF 2340 supposedly mirrors. Even if Iowa were correct that the conspicuous absence of any language paralleling the federal scheme is irrelevant, its enactment would not be saved. Iowa courts have no authority to make determinations regarding which noncitizens were entitled to enter without advance consent from federal officials, *see* 8 U.S.C. § 1326(a)(2), an immigration determination reserved for federal authorities. Iowa complains (at 27-28) that a State can neither ignore federal determinations that must be made in immigration-related proceedings

25

nor attempt to make those determinations itself. But that limitation merely arises from the fundamental incompatibility of federal immigration law with unilateral state enforcement.

Iowa fares no better in attempting to read out of the statute a provision that prohibits a state court from "abat[ing a] prosecution . . . on the basis that a federal determination regarding the immigration status of the person is pending or will be initiated." Iowa Code § 718C.6. Even accepting Iowa's implausible suggestion that the provision only prohibits courts from terminating proceedings entirely—as opposed to staying them—based on pending or forthcoming federal determinations of immigration status, the provision underscores the degree to which Iowa seeks to set up an impermissible parallel immigration scheme. And SF 2340 is preempted with or without the abatement provision, for the reasons discussed above.

Iowa asserts (at 29-31) that return orders under SF 2340 authorize it only to take a noncitizen to whichever federal officials they may find at the Des Moines airport—not to effect removal from the United States. That is not what the statute says. The statute requires a state judge to issue "an order requiring the person to return to the foreign nation from which the person entered or attempted to enter." Iowa Code § 718C.4(4). And if the person fails to comply with that order, he is subject to prosecution for a class C felony. *See id.* § 718C.5. Iowa's claim (at 53-54) that SF 2340 simply "provides for a judicial order detailing how an illegal alien will be taken to an Iowa port of entry" thus cannot be squared with the text of the statute it

26

enacted, and Iowa does not even attempt to argue that it has the authority to empower state judges to issue the orders that SF 2340 contemplates. To the contrary, Iowa concedes (at 58, 63) that the federal government has "exclusive authority to set removal destinations" and "removal standards." Regardless of whether Iowa would have authority to take noncitizens to an Iowa port of entry and turn them over to federal officials in any particular set of circumstances, those activities have nothing to do with SF 2340 as written and enacted by the State.[2]

Iowa briefly invokes *Keller v. City of Fremont*, 719 F.3d 931 (8th Cir. 2013), for the proposition that a court should not presume that a statute would be unconstitutionally applied. But there is no uncertainty here on the relevant point: the statute on its face creates an impermissible parallel regime of state immigration enforcement. In *Keller*, by contrast, the Court held that the City of Fremont had created no such scheme. *Id.* at 944. The Court went on to reject an argument that the law at issue there—a local housing restriction prohibiting renting to noncitizens whose unlawful status had been verified with the federal government—would be

---

[2] Iowa properly has not joined the argument by *amicus* Immigration Reform Law Institute that 8 U.S.C. § 1326(b) somehow authorizes States to issue unilateral removal orders. *See Amicus* Br. 7-8. That provision makes clear that removals for purposes of federal law include stipulations of removal that noncitizens may enter with federal officials to avoid further criminal prosecution either by a State or by the federal government. *See* 8 U.S.C. § 1326(b) ("[T]he term 'removal' includes any agreement in which [a noncitizen] stipulates to removal during (or not during) a criminal trial under either [f]ederal or [s]tate law."). It does not contemplate that state officials can enter into stipulations of removal, and *amicus* identifies no circumstance in which the provision has been interpreted in that fashion.

Appellate Case: 24-2265    Page: 39    Date Filed: 08/20/2024 Entry ID: 5426118

impermissibly applied to certain categories of noncitizens, noting that the record did not make clear how the federal government would reply to inquiries about those individuals. *Id.* at 945.

### 2. The United States may sue in equity to enjoin federally preempted state laws.

**a.** Congress has empowered federal courts to exercise equity jurisdiction and to grant such relief as "was traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999); *see* 28 U.S.C. §§ 1331, 1651. The United States has presented a classic equitable grievance—that the defendant is causing it direct harm through unlawful acts, here by interfering with federal operations and responsibilities. *See, e.g., American Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902).

In these circumstances, "equitable relief . . . is traditionally available to enforce federal law," unless Congress has "displace[d]" it. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015). That principle is especially true in a suit brought by the United States to vindicate its sovereign interests. Iowa does not even attempt to demonstrate that Congress has displaced equitable remedies in the circumstances of this case, so its challenge to the invocation of equitable remedies lacks merit.

To invoke an equitable right of action, a party must present the type of grievance for which an equitable remedy lies for that party. *See* Samuel L. Bray & Paul B. Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763 (2022); *see also Free Enter.*

28

*Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (injunctions may be sought to halt unconstitutional activity even without a "private right of action" (quotation marks omitted)). In line with this principle, courts have long used injunctions—with or without express statutory authorization—to prevent governmental officials from violating the law. *See, e.g.*, *Truax*, 239 U.S. at 36; *Terrett v. Taylor*, 13 U.S. (9 Cranch) 43 (1815); *Hughes v. Trustees of Morden Coll.*, (1748) 27 Eng. Rep. 973 (High Ct. Ch.). The historical tradition also reflects that courts may entertain equitable actions brought by governmental actors to prevent other governmental actors from acting unlawfully. *See, e.g.*, *Attorney-General v. Corporation of Poole*, (1838) 41 Eng. Rep. 7 (High. Ct. Ch.) (equitable action by Crown against local officials), *aff'd sub nom. Parr v. Attorney-General*, (1842) 8 Eng. Rep. 159 (H.L.).

Although Iowa points to numerous instances in which Congress has expressly authorized equitable relief, citing a brief the United States filed in the Fifth Circuit on the subject, it ignores the key point made in that brief. The statutes identified in that filing each "reflect[ed] one or more circumstances that, in the particular context at issue, made it appropriate for Congress either to modify the availability of equitable relief as compared to an historical baseline, to set forth the specific point or circumstance under which an injunctive action by the government to enforce a conduct-regulating scheme against violators would be appropriate (often as one of a range of remedies), or to clarify that related statutory provisions have not 'displace[d] the equitable relief that is traditionally available to enforce federal law.'" United States

29

Letter Brief at 1-2, *United States v. Texas*, No. 24-50149 (5th Cir. Apr. 12, 2024) (last

alteration in original) (quoting *Armstrong*, 575 U.S. at 329). The existence of

comprehensive legislation in some areas does not displace background principles of

equity in others. *See generally* Henry E. Smith, *Equity as Meta-Law*, 130 Yale L.J. 1050

(2021) (describing interstitial and second-order nature of equity); *cf. Middlesex Cty.*

*Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 14-15 (1981). In the

circumstances of this case, as noted, Iowa has provided no reason to think that

Congress intended to displace the traditionally available equitable relief.

   **b.** History and precedent also confirm that the United States has authority to

seek injunctive relief of the kind at issue here. *See United States v. San Jacinto Tin Co.*,

125 U.S. 273, 279 (1888). Like a private party, the United States may seek a

prohibitory injunction to shield itself from direct injury. *Id.* at 286. Of particular

relevance here, federal courts undoubtedly may grant injunctions to the United States

to protect its sovereign interests. The United States has frequently sued in equity

when those interests were threatened or harmed. *See, e.g., id.* (invalidation of land

grant); *Arizona*, 567 U.S. 387 (preemption of state immigration law); *United States v.*

*Texas*, 143 U.S. 621 (1892) (boundary dispute); *United States v. American Bell Tel. Co.*,

128 U.S. 315 (1888) (invalidation of patent). Here, as in *Arizona*, the United States has

a sovereign interest in its ability to enforce federal immigration law uniformly, free

from state interference. The United States also has a sovereign interest in preserving

Appellate Case: 24-2265     Page: 42     Date Filed: 08/20/2024 Entry ID: 5426118

its ability to carry out its treaty obligations and conduct diplomacy with its neighbors. It may sue in equity to vindicate those interests.

The Supreme Court unanimously recognized that the United States may bring such suits in *In re Debs*, 158 U.S. 564 (1895), when it held that the federal government may obtain an injunction to "enforce in any part of the land the full and free exercise of all national powers," *id.* at 582. *Debs* endorsed and embodied the "general rule that the United States may sue to protect its interests." *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967). And Iowa's contention (at 35-36) that *Debs* turned on the United States' proprietary interest in the mails or its authority to abate a public nuisance is inconsistent with the Court's own explanation of its holding in *Debs* itself. The Court noted the government's proprietary interest in the mails but then stated: "We do not care to place our decision upon this ground alone." *Debs*, 158 U.S. at 584. And rather than limiting its holding to public nuisance, the Court stated that the United States, "entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other." *Id.* Iowa thus quickly returns to its refrain of asking this Court to disregard binding Supreme Court precedent. *See* Br. 36 ("*Debs* may be on shaky ground." (citing Transcript of Oral Argument at 86:7-9, *Moyle v. United States*, 144 S. Ct. 2015 (2024) (per curiam))).

Subsequent decisions have recognized the United States' right to sue to protect other sovereign interests. *See, e.g.*, *Sanitary Dist. of Chi. v. United States*, 266 U.S. 405, 425 (1925) (authority to sue "to carry out treaty obligations"). At an absolute minimum, the United States' authority to bring the long-established right of action to enjoin constitutional violations that directly harm the plaintiff should be beyond dispute.

**c.** The doctrine of *Ex parte Young*, 209 U.S. 123, 167 (1908), leaves no doubt that the United States may pursue relief here. *Ex parte Young* endorsed the longstanding practice of actions to enjoin state officials from violating the federal Constitution in a manner that directly harms a plaintiff. *See id.* at 167 (citing *Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738 (1824)). Iowa's suggestion (at 36) that the United States' rights in this regard are limited to circumstances in which the federal government is about to be the subject of a state enforcement action ignores that equitable powers extend much more broadly. *See, e.g.*, *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 252 (2011) (suit filed by one governmental entity against another governmental entity to compel production of records); *Johnson v. Griffin*, 69 F.4th 506, 513 (8th Cir. 2023) (suit to compel testing of DNA evidence); *Courthouse News Serv. v. Gilmer*, 48 F.4th 908, 911-12 (8th Cir. 2022) (suit to compel prompt public access to court filings).

Appellate Case: 24-2265    Page: 44    Date Filed: 08/20/2024 Entry ID: 5426118

### 3. The United States may challenge Section 4.

Iowa briefly suggests that the United States may not challenge Section 4 of SF 2340, which provides for orders requiring noncitizens to return to the foreign country from which they entered the United States. This Court need not reach that issue, as an injunction against the criminal provision in Section 2 would necessarily block enforcement of the associated remedial provision. But in any event, for similar reasons, there is no barrier to challenging the remedy on its own terms.

An injunction preventing Iowa and its officers and agents (including state prosecutors) from enforcing Section 4 would provide substantial redress to the United States. Criminal proceedings do not proceed independently, with state judges issuing remedial orders *sua sponte*. The district court's injunction prohibits state prosecutors from seeking such an order from a court or from seeking agreement from noncitizens to agree to such an order. And it prohibits the State from prosecuting violations of such orders, which are expressly backed by criminal penalties.

Moreover, even if Iowa were correct that the district court could not issue an injunction against Section 4 itself, that would simply underscore the propriety of the injunction against the whole state enactment. If Iowa is correct that a state judge must automatically order the removal of any person convicted of unlawful reentry and that "[n]on-party judges could still issue return orders" even if the State is enjoined from enforcing Section 4, Br. 46-47, then the availability of such return orders renders the operation of the scheme as a whole unconstitutional. The preliminary injunction

33

entered by the district court addresses that unconstitutionality because it prevents

State officials from initiating any prosecutions and thus prevents return orders.

## II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CONCLUDING THAT THE BALANCE OF HARMS AND THE PUBLIC INTEREST WARRANT A PRELIMINARY INJUNCTION

**1.**  The Supreme Court has suggested that irreparable harm inherently results

from the enforcement of a preempted state law.  *See New Orleans Pub. Serv., Inc. v.

Council of New Orleans*, 491 U.S. 350, 366-67 (1989); *see also* App. Vol. II 465; R. Doc.

29, at 23 (collecting cases).  Beyond those inherent harms, enforcement of SF 2340

would directly and irreparably harm core federal interests.

SF 2340 would allow Iowa to expel citizens of many nations to Mexico or

another country from which they entered the United States.  When a country believes

its nationals have been mistreated in the United States, it may respond with "harmful

reciprocal treatment of American citizens abroad."  *Arizona*, 567 U.S. at 395; App.

Vol. II 466; R. Doc. 29, at 24 (recognizing "impacts on international relations and

foreign affairs").  And the potential violation of Mexico's and other nations'

sovereignty, which Iowa's actions threaten, may derail important bilateral negations.

App. Vol. II 310; R. Doc. 7-2, at 7.  For this and other reasons, if Iowa enforces

SF 2340, it will seriously injure the United States' diplomatic relationships with

Mexico and other nations.  *See* App. Vol. II 306-16; R. Doc. 7-2, at 3-13.  Far from

helping to stem the tide of irregular migration over the southern border, SF 2340

would hamper federal efforts to address irregular migration and its root causes by

34

interfering with the United States' relationship with Mexico, whose cooperation is important to addressing irregular migration. App. Vol. II 311-14; R. Doc. 7-2, at 8-11. The "representations by the Executive Branch supported by formal diplomatic protests and concrete disputes are more than sufficient to demonstrate" as a matter of law that a state law interferes with federal foreign policy. *Crosby*, 530 U.S. at 386.

Moreover, SF 2340 is inconsistent with the United States' treaty obligations. *See* App. Vol. II 314-16; R. Doc. 7-2 at 10-12. Most prominently, as noted, the Convention Against Torture and the federal regulations implementing the United States' obligations under this treaty prohibit refoulement, the return of a noncitizen to a country where he more likely than not would be tortured. *E.g.*, 8 C.F.R. § 1208.16(c)-.18; *see* 8 U.S.C. § 1231 note. SF 2340 has no provision to prevent refoulement. App. Vol. II 322-23; R. Doc. 7-3 at 6-7.

SF 2340 would also interfere with the federal government's orderly processing of noncitizens who have unlawfully entered the United States. A noncitizen facing simultaneous SF 2340 enforcement proceedings and federal proceedings "would be unable to participate fully in federal immigration proceedings," "attend scheduled interviews," or "comply with required identity and security check procedures." App. Vol. II 323; R. Doc. 7-3 at 7. SF 2340 would thus impede the federal government's enforcement of federal immigration law.

**2.** Iowa's response largely rehashes its mistaken merits arguments. *See* Br. 68 ("The district court's irreparable harm finding relied on erroneous statutory

interpretation and its novel reasoning that SF[ ]2340 is likely preempted by federal law." (quotation marks omitted)). In contrast to the significant harms the United States would face if Iowa enforced SF 2340, Iowa would not face significant harm from an injunction that merely maintains the status quo that has been in place for nearly 150 years. *See* App. Vol. II 466-67; R. Doc. 29, at 24-25 (holding that public interest and balance of harms favors federal government). Iowa has no legitimate state interest in intruding upon federal immigration enforcement. Nor has Iowa put forward any evidence at all to support its assertions of harm. Finally, because SF 2340 will interfere with federal immigration enforcement and with the federal government's relationship with Mexico and other nations, staying the district court's injunction could worsen irregular migration, not improve it. Iowa, therefore, cannot show harm from the injunction.

**3.** The district court properly enjoined the statute in all its applications. As discussed above, Iowa has not identified any circumstance in which the statute could be constitutionally applied. Nor does Iowa identify any provision of the law that could properly be severed. As discussed above, the criminal provisions and the authorization for state judges to order removal from the United States are preempted. And the remaining provisions are ancillary provisions that Iowa conceded in the district court could not properly be severed. *See* App. Vol. II 467; R. Doc. 29, at 25.

36

# CONCLUSION

For the foregoing reasons, the preliminary injunction should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

DANIEL TENNY

*/s/ Leif Overvold*

LEIF OVERVOLD
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7226*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-4631*
*leif.overvold2@usdoj.gov*

August 2024

Appellate Case: 24-2265     Page: 49     Date Filed: 08/20/2024 Entry ID: 5426118

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,177 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

Pursuant to Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses, and the brief is virus free.

*/s/ Leif Overvold*
LEIF OVERVOLD

**CERTIFICATE OF SERVICE**

I hereby certify that on August 19, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

_/s/ Leif Overvold_
LEIF OVERVOLD